**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WILMER CHAVARRIA,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0525;
U.S. CUSTOMS AND BORDER PROTECTION, 1300 Pennsylvania Avenue, Suite 4.4-B, Washington, DC 20229;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 500 12th St SW, Washington, DC 20536;
MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
2707 Martin Luther King Jr. Ave. SE Washington, DC 20528-0525;
RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,
1300 Pennsylvania Avenue, Suite 4.4-B, Washington, DC 20229; and
DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement, 500 12th St SW Washington, DC 20536;

Defendants.

Case No. 1:25-cv-04289

**FIRST AMENDED COMPLAINT**

## INTRODUCTION

1. Wilmer Chavarria is an American by choice. He came to the United States in 2008 for college and has been a naturalized U.S. citizen since 2018.

2. Now a successful K-12 education professional, Wilmer has traveled multiple times per year for the past fifteen years to visit his mother and other family members in Nicaragua—as well as to other countries for educational, personal, and professional reasons.

3. On July 21, 2025, upon returning home from Nicaragua, Wilmer was detained at the George Bush Intercontinental Airport in Houston by government agents for no given reason. It was the first time in fifteen years of international travel he had been detained for anything beyond a brief check of his legal status.

4. The officers were enforcing agency policies that violate the Fourth Amendment. Wilmer was separated from his husband and taken to an isolated secondary screening area, where he was repeatedly pressured to hand over his laptop, smartphone, and tablet, along with his passwords. When he objected, he was told he had no Fourth Amendment rights at the border. Moreover, he was told he was behaving suspiciously simply by asserting those rights and refusing to consent to the device searches. His requests to contact his family and lawyer were denied during the detention.

5. As a school superintendent, Wilmer's primary concern was for the privacy of the student data on his devices. He was also concerned about preserving the privacy of his own personal communications, media, and information contained on his personal phone. Only after enduring hours of isolation, physical discomfort,

threats, and badgering—including one officer's suggestion that Wilmer's refusal to hand over his passwords could negatively affect his job—did Wilmer finally succumb to the pressure and hand over his devices and passwords.

6. While the agents gave Wilmer assurances that they would not access the student data on his laptop, Wilmer does not know what media or data they viewed or exported from his devices. The searches were conducted outside his presence, during a time period Wilmer estimates to have been at least two hours.[1] Eventually the officers returned his devices to him and allowed him to leave.

7. In late July 2025, shortly after Wilmer's detention, an anonymous email was sent to each member of the Board of School Trustees in the district where he serves as Superintendent. The email suggested the Board should have "information technology staff or a competent third party conduct a forensic audit of Mr. Chavarria's district issued phone and laptop." Alternatively, the email's author suggested "a FOIA request to Customs and Border Protection for their report of the contents of the district's devices." The email's author was mistaken about Wilmer's phone having been district-issued. The phone was Wilmer's personal phone.

8. In early February 2026, a Freedom of Information Act ("FOIA") request was submitted to CBP on behalf of Wilmer seeking information about his detention and the searches performed on his devices. Later that month, two heavily redacted documents were returned. One appears to be a copy of an email forwarded by "Watch

[1] The principal officer who detained Wilmer did open and scroll through one of his cellphone apps in his presence, but only because it could not be opened without facial recognition.

Commander, Area Port of Houston – Airports" on December 15, 2025, just days after this action was initially filed. The sender and recipient names, subject line, and all substantive content are fully redacted, including what appears to be CBP records forwarded on July 22, 2025, by the same individual to another recipient, the name also redacted. The second document is a compilation of heavily redacted reports, all of which are dated December 15, 2025. One of the reports, titled "U.S. Customs and Border Protection, U.S. Department of Homeland Security, TECS – Electronic Media Report," states that "a **(b)(7)(E)** electronic media exam of CHAVARRIA's electronics was requested **(b)(7)(E)**. The **(b)(7)(E)** electronic media exam request was approved by Supervisor **(b)(6)(b)(7)(C) (b)(7)(E)**."

9. Per the CBP email accompanying the FOIA return, "(b)(7)(E)" indicates a redaction performed under 5 U.S.C. § 552 "when techniques and procedures for law enforcement investigations or process would be disclosed or provided such disclosure could reasonably be expected to risk circumvention of law." The other redactions appear to have been conducted "[p]ursuant to DHS Instruction 262-11-004, [under which] FOIA Officers at DHS have been instructed to withhold personally identifiable information (PII) and sensitive personally identifiable information (SPII) of DHS personnel unless a determination is made that the disclosure does not raise security or privacy concerns, or if those concerns are outweighed by any public interest in that information."

10. Because the then-effective 2018 CBP Directive required supervisor approval for all "advanced" forensic searches of electronic devices, *see* paras ___ and

___, *infra*, and because the specification of search type is redacted in the TECS – Electronic Media Report, it is believed that forensic searches were performed on Wilmer's devices.

11. Wilmer is justifiably concerned that he will be subjected to future Fourth Amendment violations during his regular international travels. He intends to continue visiting his mother and other family members in Nicaragua, and to travel for business and other personal reasons.

12. The government policies challenged in this Complaint violate the Fourth Amendment, are unlawful, and, therefore, must be set aside under the Administrative Procedure Act. Further, to protect his property and privacy rights, Wilmer asks this Court to enjoin enforcement of the policies against him.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the case arises under U.S. Const. amend. IV and 5 U.S.C. §§ 701–706.

14. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and its inherent equitable powers, and to set aside unlawful agency action pursuant to 5 U.S.C. § 706.

15. Venue is proper in this Court under 28 U.S.C. § 1391(e) because the Defendants, agencies and individuals, acting in their official capacities, reside in this district and a substantial part of the events giving rise to the claims occurred in this

district. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act generally proper in "a court of competent jurisdiction").

## PARTIES

16. Plaintiff Wilmer Chavarria is a U.S. citizen who resides in Vermont. He is a school superintendent.

17. Defendant U.S. Department of Homeland Security ("DHS") is an agency of the U.S. Government within the meaning of 5 U.S.C. § 551 and 5 U.S.C. § 702. DHS is headquartered in Washington, D.C. It is responsible for policies and procedures governing the conduct of U.S. Customs and Border Protection Officers and U.S. Immigration and Customs Enforcement Special Agents at the border, including those challenged here.

18. Defendant U.S. Customs and Border Protection ("CBP") is an agency of the U.S. Government within the meaning of 5 U.S.C. § 551 and 5 U.S.C. § 702. CBP is headquartered in Washington, D.C. It is responsible for policies and procedures governing the conduct of CBP Officers, including those challenged here.

19. Defendant U.S. Immigrations and Customs Enforcement ("ICE") is an agency of the U.S. Government within the meaning of 5 U.S.C. § 551 and 5 U.S.C. § 702. ICE is headquartered in Washington, D.C. It is responsible for policies and procedures governing the conduct of ICE Special Agents, including those challenged here.

20. Defendant Markwayne Mullin[2] is the Secretary of DHS. He has authority over all DHS policies and procedures, including CBP's and ICE's policies and procedures challenged here. Plaintiff sues him in his official capacity.

21. Defendant Rodney S. Scott is the Commissioner of CBP, which controls U.S. ports of entry. He has authority over all CBP policies and procedures, including those challenged here. Plaintiff sues him in his official capacity.

22. Defendant David J. Venturella[3] is the Senior Official Performing the Duties of the Director of ICE. He has authority over all ICE policies and procedures, including those challenged here. Plaintiff sues him in his official capacity.

## FACTUAL ALLEGATIONS

### The Directives

23. CBP's 2018 directive 3340-049A, "Border Searches of Electronic Devices", https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/CBP-Directive-3340-049A-Border-Search-of-Electronic-Media-Compliant.pdf [https://perma.cc/G8YH-5LZ4] (last visited Dec. 9, 2025), ("2018 CBP Directive") expressly authorizes the warrantless searches Plaintiff challenges.

24. 2018 CBP Directive § 5.1.3 authorizes a "Basic Search," during which "an Officer may examine an electronic device and may review and analyze

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the Secretary of Homeland Security, Markwayne Mullin, is automatically substituted for Kristi Noem.
[3] Pursuant to Federal Rule of Civil Procedure 25(d), the Senior Official Performing the Duties of the Director of ICE, David J. Venturella, is automatically substituted for Todd M. Lyons.

information encountered[.]" It provides that, when performed "at the border," a Basic Search may be conducted "with or without suspicion."

25. 2018 CBP Directive § 5.1.4 authorizes an "Advanced Search," during which "an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents." The 2018 CBP Directive provides that an Advanced Search may be performed in "instances in which there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern, and with supervisory approval[.]"

26. 2018 CBP Directive § 5.4 authorizes warrantless seizure, retention, and review of "electronic devices, or copies of information contained therein, for a brief, reasonable period of time," so long as "supervisory approval" is obtained. The periods of time specified as "reasonable" range from five to fifteen days—or even more in some cases.

27. 2018 CBP Directive § 5.4.1.2 provides that, upon completion of the "thorough border search," if "there is no probable cause to seize the device or the information contained therein, any copies of the information held by CBP must be destroyed . . . as expeditiously as possible." 2018 CBP Directive § 5.5, titled "Retention and Sharing of Information Found in Border Searches," lists myriad exceptions to this policy, none of which requires independent judicial review.

28. Senator Ron Wyden, in a September 15, 2022, letter to CBP, https://www.wyden.senate.gov/imo/media/doc/Wyden%20letter%20to%20CBP%20on

%20border%20searches%20of%20devices.pdf [https://perma.cc/XAS8-CYNK], at 2 (last visited Dec. 9, 2025), recounted that CBP, during a briefing given to him in June of that year, "confirmed . . . that it stores . . . deeply personal data taken, without a warrant signed by a judge, from Americans' phones for 15 years and permits approximately 2,700 DHS personnel to search this data at any time, for any reason."

29. CBP's web page providing the public with the alleged justification for and explication of its policies authorizing warrantless searches of citizens' electronic devices, "Border Search of Electronic Devices at Ports of Entry," https://www.cbp.gov/travel/cbp-search-authority/border-search-electronic-devices [https://perma.cc/GE2P-CTMW] (last visited June 23, 2026), is frequently updated and was last modified on June 17, 2026.

30. In October 2023, CBP issued a "Border Searches of Electronic Devices Tear Sheet," https://www.cbp.gov/sites/default/files/assets/documents/2023-Oct/Border%20Search%20of%20Electronic%20Devices%20Tearsheet.pdf [https://perma.cc/M3ZK-3SVD] (last visited Dec. 9, 2025), available by link from the web page referenced in the preceding paragraph. Its contents are similar to a brochure that an individual wearing a CBP badge and introduced to Wilmer as a supervisor gave Wilmer to read after he refused to consent to warrantless searches of his electronic devices during his July 21, 2025, detention at the Houston airport.

31. 2018 CBP Directive § 2.7 contemplates "conveyance to ICE" of both devices and information or media contained thereon, and states that "conveyance to

ICE is not limited by the terms of this Directive, and ICE policy will apply upon receipt by ICE."[4]

32. In 2009, ICE issued a directive, "Border Searches of Electronic Devices," https://www.dhs.gov/xlibrary/assets/ice_border_search_electronic_devices.pdf [https://perma.cc/5DBR-SH8N] (last visited Dec. 9, 2025) ("ICE Directive"), which also authorizes warrantless searches of the type Plaintiff experienced and now challenges.

33. Unlike the 2018 CBP Directive, the ICE Directive does not divide searches into "Basic" or "Advanced." Instead, ICE Directive § 6.1 authorizes the search of electronic devices at the border, with or without suspicion, so long as those searches are conducted by "ICE Special Agents."

34. ICE Directive § 8.1.1 states that the category of "ICE Special Agents" authorized to conduct warrantless, suspicionless searches of electronic devices is a broad category that can include "a CBP Officer or Border Patrol Agent."[5]

35. In January of 2026, CBP issued directive 3340-049B, "Border Searches of Electronic Devices," https://www.cbp.gov/sites/default/files/2026-01/cbp_directive_3340-049b_jan_2026_508.pdf [https://perma.cc/2HF2-YZSK] (last visited June 23, 2026) ("2026 CBP Directive"). The government takes the position that the 2026 CBP

[4] While it is not yet known whether ICE Special Agents were involved in Wilmer's July 2025 detention and search of his devices, the ICE Directive's policy could impact Wilmer during his future travels.

[5] CBP Directive § 2.7 refers to ICE agents who "exercise concurrently-held border search authority that is covered by ICE's own policy and procedures" as "Homeland Security Investigations (HSI) Special Agents."

directive supplants the 2018 CBP Directive. The 2026 CBP Directive, like the 2018 CBP Directive, expressly authorizes the warrantless searches Plaintiff challenges.

36. 2026 CBP Directive § 5.1.4 is fundamentally identical to its 2018 counterpart. To the extent it differs, it even further weakens Fourth Amendment protections for property rights and privacy of travelers at the border. Whereas advanced searches under the 2018 CBP Directive required reasonable suspicion and supervisory approval, even with respect to "activity . . . in which there is a national security concern," the 2026 CBP Directive's language clearly contemplates "instances . . . when there is a national security concern" without any "individualized reasonable suspicion" of any activity whatsoever. In addition, this section of the 2026 CBP Directive specifies no basis upon which such a "concern" must rest. Moreover, this section allows approval to conduct advanced searches to be given by any of a broad array of government officials "or their delegate," as appropriate. 2026 CBP Directive, at § 5.1.4.

37. 2026 CBP Directive § 3.4 classifies as "basic" a number of searches that involve the attaching of forensic equipment to an electronic device, sometimes even making a copy of its contents. It provides that the "use of external equipment . . . to make the contents of the device available for inspection (including, for example, to bypass a password, overcome encryption, translate content, view files . . . or charge a device) does not constitute an advanced search." 2026 CBP Directive, at § 3.4. It further specifies that "use of external equipment to copy the contents of a device solely

to segregate privileged material from non-privileged material . . . does not convert a basic search into an advanced search." 2026 CBP Directive, at § 5.2.1.2.

38. 2026 CBP Directive § 2.8, the parallel provision to 2018 CBP Directive § 2.7, still contemplates devices or their copied contents being conveyed to ICE and, when conveyed, covered by "ICE's own policy and procedures." 2026 CBP Directive, at § 2.8. But the section also refers to "HSI policy," which is said to "apply upon HSI's receipt of the device or information." *Id*. It is reasonable to assume that "HSI policy" is distinct from "ICE policy," given that § 2.8 refers to both, but it is unclear to what directive, guidance, or other document "HSI policy" refers.

**The Rationales for the Border Search Exception**

39. The 2026 CBP Directive, the 2018 CBP Directive, and the ICE Directive are all issued on the assumption that the so-called "border exception" to the Fourth Amendment's warrant requirement covers searches of electronic devices and their contents. *See* 2026 CBP Directive § 4.2 ("The authority of the Federal Government to conduct searches and inspections of persons and merchandise crossing our nation's borders is well-established and extensive; control of the border is a fundamental principle of sovereignty."); 2018 CBP Directive § 4 ("The plenary authority of the Federal Government to conduct searches and inspections of persons and merchandise crossing our nation's borders is well-established and extensive; control of the border is a fundamental principle of sovereignty."); ICE Memorandum, "Border Searches of Electronic Devices Directive," August 31, 2009, https://www.ice.gov/doclib/foia/policy/directive10044.1_BorderSearchesElectronicDe

vicesMemo_08.31.2009.pdf [https://perma.cc/AS7L-KGRF] (last visited Dec. 9, 2025) ("Border searches are a well-recognized and long-established exception to the probable cause and warrant requirements of the Fourth Amendment.").

40. The rationales commonly held to underlie the border exception are: (1) ensuring payment of taxes on imported goods, *see, e.g.*, *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); (2) identifying those entering the U.S. unlawfully, *see, e.g.*, *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973); and (3) preventing the importation of weapons or contraband, *see, e.g.*, *Montoya de Hernandez*, 473 U.S. at 537. *See also* 2018 CBP Directive § 4 (explaining that CBP has the responsibility to enforce customs laws as well as to "detect, respond to, and interdict . . . persons who may undermine the security of the United States . . . [and] dangerous goods." (citing 6 U.S.C. § 211)).

41. Traditionally, the border exception has justified searches of persons entering the United States and their *physical property*. *See, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (holding warrantless removal, disassembly, and inspection of car's gas tank falls within the border exception).

**The Directives' Effect on American Citizens Generally**

42. As of November 2025, 98% of Americans own a cellphone, with 91% owning smartphones. "Mobile Fact Sheet," Nov. 20, 2025, Pew Research Center, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Dec. 9, 2025). A 2025 survey found that 83% of United States adults own a laptop computer, Dashia Milden, *Sorry, Smartphones, but Laptops Aren't Going Anywhere, CNET Survey*

*Finds. Here's Why*, Aug. 12, 2025, CNET, https://www.cnet.com/tech/laptop-survey-2025/ (last visited Dec. 9, 2025), and, as of 2021, approximately 64% of American households owned a tablet, *Computer and Internet Use in the United States: 2021*, June 18, 2024, United States Census Bureau, https://www.census.gov/newsroom/press-releases/2024/computer-internet-use-2021.html (last visited Dec. 9, 2025).

43. Smartphone owners routinely carry their devices everywhere they go, including while traveling. Travelers use smartphones for communication, social networking, shopping, navigation, banking, photography, and more.

44. Carrying laptops or tablets while traveling is becoming more common, as their decreasing weight over time makes them easier to carry.[6] At the same time, their routine use for remote work, including while traveling, has become more common since the COVID-19 pandemic. Ronnie Dungan, *'Laptop luggers' | Remote workers will spend longer away over the holidays, but will be working, says survey*, HR Grapevine, Nov. 18, 2024, https://www.hrgrapevine.com/us/content/article/2024-11-18-remote-workers-will-spend-longer-away-over-the-holidays-but-will-be-working-says-survey (last visited Dec. 9, 2025).

45. Each year, the storage capacity of electronic devices grows. Laptops sold in 2025 can store up to four terabytes of data. "Compare Mac Models," https://www.apple.com/mac/compare/ (last visited Dec. 9, 2025). Smartphones are not

[6] For example, The New York Times Wirecutter describes "The best Windows laptop" as of December 2025 as "a bit heavy" at 3.04 pounds. Kimber Streams, Dave Gershgorn, and Haley Perry, *The Best Laptops*, Wirecutter, Dec. 9, 2025, https://www.nytimes.com/wirecutter/reviews/best-laptops/ (last visited Dec. 9, 2025).

far behind, with some models now storing up to two terabytes. "Buy iPhone 17 Pro," https://www.apple.com/shop/buy-iphone/iphone-17-pro (last visited Dec. 9, 2025).

46. With the rapidly increasing storage capacity of these devices, it is possible to upgrade and transfer all the data from one's previous device to the next. This means a single device can contain many years' worth of personal, private data and may enable access to even more data stored on cloud-based servers.

47. Over the past decade, the number of electronic device searches at ports of entry more than quadrupled, from around 8,500 in 2015 to over 46,000 in 2024.[7] As the data show, each year thousands of Americans are subjected to warrantless, suspicionless searches of their electronic devices.

48. Attorneys and journalists are among those who are concerned that, if they are "suspicious" in the opinion of government officials, they are more likely to be subjected to a warrantless electronic device search at the border. Some now opt to travel with "burner phones" to avoid the risk of their privileged information being compromised. Andy Greenberg and Matt Burgess, *How to Enter the US With Your Digital Privacy Intact*, Wired, Mar. 24, 2025, https://www.wired.com/2017/02/guide-getting-past-customs-digital-privacy-intact/ [https://perma.cc/44G7-MAVF] (last visited Dec. 9, 2025).

---

[7] Kyle Sweetland, et al., *Searches of Electronic Devices at Ports of Entry*, https://pacificlegal.org/wp-content/uploads/2025/12/SR-1299-Sweetland-Peikoff-and-Scacchi-Policy-Explainer-Searches-of-Electronic-Devices-at-Ports-of-Entry.pdf (last visited Dec. 9, 2025). It is unclear whether these figures include searches performed by ICE Agents after "conveyance to ICE" as contemplated in CBP Directive § 2.7.

49. Still other Americans, whose concerns are wholly personal, are outraged that, simply because they choose to travel internationally, they must decide between leaving their electronic devices at home or risking being detained and having their device contents perused, uploaded into a government database, or maybe even shared with multiple government agencies—all without a warrant or probable cause. Considering this risk, some take precautions such as deleting their social media accounts from their devices or encrypting their hard drives in advance of travel. *Id.*

**The Directives' Effect on Plaintiff**

50. CBP's and ICE's policies, embodied in these agencies' directives, threaten Wilmer Chavarria with unreasonable, warrantless searches or seizures whenever he travels internationally, as the policies permit suspicionless "Basic Searches" of electronic devices and, at best, require only reasonable suspicion and agency supervisor approval—a low bar to meet—for "Advanced Searches."

51. As a consequence of the CBP and ICE Directives, and the increasing frequency with which warrantless searches of electronic devices are conducted at the border, Wilmer faces the choice of either (1) continuing to carry his devices with him when he travels and risk again being subjected to warrantless, suspicionless searches or seizures of his electronic devices and their contents whenever he passes through a border zone or point of entry, or (2) not carrying his devices with him when he travels, and losing their functionality for both personal and professional purposes—including his ability to remain connected with his friends, family, and colleagues.

52. On subsequent visits to Nicaragua in October 2025, December 2025, February 2026, and April 2026, Wilmer traveled without any of his electronic devices (phone, laptop, and tablet) to avoid an encounter with government agents like that he had experienced in July 2025. The encounter convinced him, not only of the injustice and unconstitutionality of the CBP and ICE policies, but also of the lack of prudence and professionalism on the part of the officers who detained and badgered him in implementation of those policies. In particular, the female officer who primarily engaged with Wilmer described a previous detainee, and the contents of that detainee's device, in such detail that Wilmer was concerned that, should she do the same to him, he could be identified by the next detainee to whom she chooses to divulge the spoils of her intrusions on citizens' personal lives.

53. Wilmer did not make the decision to leave his devices at home during his future travels lightly. He did this at the cost of his being unable to work remotely while visiting his family and otherwise forgoing the features of electronic devices that make life richer. This is a choice no American should have to make.

## CLAIM FOR RELIEF

### CBP and ICE Policies, Embodied in the 2026 CBP Directive, the 2018 CBP Directive, and the ICE Directive, Violate the Fourth Amendment

### (U.S. Const. amend. IV and 5 U.S.C. § 706(2)(B))

54. Plaintiff alleges and incorporates by reference every allegation set forth in the preceding paragraphs.

55. The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures" of "persons, houses, papers, and effects." U.S. Const. amend. IV.

56. The documents, media, and information stored on Plaintiff's devices, as well as the devices themselves, are his private property and are "papers" and "effects" protected by the Fourth Amendment against unreasonable searches and seizures.

57. Defendants' policies authorizing warrantless, suspicionless searches and seizures of electronic devices at the border, to which Plaintiff has been subjected in the past and is at risk of being subjected to in the future, violate the Fourth Amendment. They do so by authorizing and facilitating unreasonable searches and seizures of Plaintiff's electronic devices (his papers and effects), absent a warrant supported by probable cause that those devices contain contraband or evidence of a violation of immigration or customs laws, and without particularly describing the information to be searched or seized.

58. No rationale for a judicially recognized exception to the Fourth Amendment's warrant requirement is applicable, as would be necessary to render reasonable the warrantless, suspicionless searches and seizures of electronic devices at the border authorized by CBP's and ICE's Directives. In particular, unlike the physical property to which the traditional border exception extends, electronic devices cannot store "goods" and "articles," the tangible physical objects which are subject to tariffs. Orin Kerr, *The Digital Fourth Amendment: Privacy and Policing in Our Online World* 122 (Oxford Univ. Press 2025). Nor can they conceal someone

attempting to enter the U.S. unlawfully. *Id*. And while digital contraband does exist, such contraband can also be emailed or stored in the cloud for remote access from anywhere in the world, making searches for such contraband a general criminal law interest, not a border concern. Accordingly, the normal Fourth Amendment rules and warrant requirement apply. *Id*. at 123.

59. Accordingly, Defendants' policies embodied in the 2026 CBP Directive, the 2018 CBP Directive, and the ICE Directive are contrary to the U.S. Constitution's Fourth Amendment and must be set aside pursuant to 5 U.S.C. § 706(2)(B).

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for relief as follows:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, holding CBP's and ICE's policies authorizing warrantless, suspicionless searches of U.S. citizens' electronic devices, embodied in the CBP and ICE Directives, and associated promulgating and implementing materials issued by the agencies, unconstitutional;

B. An order, pursuant to 5 U.S.C. § 706(2), holding unlawful and setting aside the 2026 CBP Directive, the 2018 CBP Directive, and the ICE Directive;

C. An injunction, pursuant to 28 U.S.C. § 2202, Federal Rule of Procedure 65, and the Court's inherent equitable powers, prohibiting Defendants from performing warrantless searches of Plaintiff's electronic devices;

D. An award of reasonable attorney fees and costs to Plaintiff, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

E. Such other relief the Court deems just and proper.

**DATED:** July 2, 2026.

Respectfully submitted,

/s/ Amy Peikoff
AMY PEIKOFF
D.D.C. Bar No. CA00242
Pacific Legal Foundation
3100 Clarendon Blvd, Ste. 1000
Arlington, VA 22201
Telephone: (202) 888-6881
APeikoff@pacificlegal.org

JOHANNA TALCOTT*
Fla. Bar No. 1008094
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410,
Telephone: (561) 691-5000
JoTalcott@pacificlegal.org

**pro hac vice*

*Counsel for Plaintiff*