**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER CHAVARRIA,<br><br>Plaintiff,<br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BORDER PROTECTION; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement;<br><br>Defendants. | Case No. 1:25-cv-04289-DLF |

**PLAINTIFF WILMER CHAVARRIA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii
INTRODUCTION ........ 1
BACKGROUND ........ 4
A. The July 2025 Search ........ 4
B. The Directives ........ 5
C. Mr. Chavarria's Travel Since the Search ........ 7
D. Procedural History ........ 8
LEGAL STANDARD ........ 8
ARGUMENT ........ 10
I. The Court Has Jurisdiction ........ 10
A. Mr. Chavarria Has Standing to Seek Prospective Relief Against the Directives ........ 10
1. This case is unlike *Lyons* because the directives *are* the authorization.. 11
2. Mr. Chavarria faces a substantial risk of another search. ........ 13
3. Mr. Chavarria's precautions are not self-inflicted injury. ........ 18
B. Mr. Chavarria Has Standing to Challenge the ICE Directive ........ 20
C. A Favorable Decision Would Redress Mr. Chavarria's Injury ........ 21
D. The Challenge to the 2018 Directive Is Not Moot ........ 24
II. The Amended Complaint States a Fourth Amendment Claim ........ 28
A. The Claim Challenges Suspicionless Searches of Device Contents, and the Directives Authorize Them ........ 28
B. The Question Is Open in This Circuit, and the Circuits Are Divided ........ 32
C. The Border-Search Exception Does Not Extend to Reading a Traveler's Papers ........ 35
1. The contents of a device are the owner's papers, and the border exception has never reached the reading of papers. ........ 35
2. *Riley*'s method leads to the same conclusion. ........ 38
III. The Court Should Decide the Claim, and Dismissal with Prejudice Is Unwarranted ........ 40
A. Equitable Discretion Is Not a Second Test of Standing or a Preview of the Merits ........ 40
B. *Eccles* Supports Review Here ........ 41
C. The Political Branches' Actions Have Provided No Reason to Abstain ...... 43

D. Dismissal With Prejudice Is Unwarranted ... 45
CONCLUSION ... 45
CERTIFICATE OF SERVICE ... 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdellatif v. DHS*,
109 F.4th 562 (D.C. Cir. 2024) ........ 34

*Abidor v. Napolitano*,
990 F. Supp. 2d 260 (E.D.N.Y. 2013) ........ 15–17, 42–43

*Action on Smoking & Health v. CAB*,
713 F.2d 795 (D.C. Cir. 1983) ........ 27

*AFL-CIO v. Chao*,
496 F. Supp. 2d 76 (D.D.C. 2007) ........ 27

*Ahmed v. Kable*,
No. 1:21-cv-03333 (TJK), 2023 WL 6215024 (D.D.C. Sep. 25, 2023) ........ 23

*Akiachak Native Cmty. v. Dep't of the Interior*,
827 F.3d 100 (D.C. Cir. 2016) ........ 27

*Alasaad v. Mayorkas*,
988 F.3d 8 (1st Cir. 2021) ........ 12, 15

*Alasaad v. Nielsen*,
419 F. Supp. 3d 142 (D. Mass. 2019) ........ 15

*Alasaad v. Nielsen*,
No. 17-cv-11730-DJC, 2018 WL 2170323 (D. Mass. May 9, 2018) ........ 12, 15

*Anibowei v. Blanche*,
No. 26-208 (U.S. Sep. 29, 2026) ........ 34

*Anibowei v. Bondi*,
No. 24-11042, 2025 WL 3231720 (5th Cir. Nov. 19, 2025) ........ 4

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........ 41

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ........ 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 9

**Attias v. CareFirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ........ 8, 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 9–10

*Boyd v. United States*,
116 U.S. 616 (1886) ........................................................................................... 35

*Carpenter v. United States*,
585 U.S. 296 (2018) ........................................................................ 34, 38, 40, 45

*Chafin v. Chafin*,
568 U.S. 165 (2013) ........................................................................................... 25

*Chatrie v. United States*,
609 U.S. 605 (2026) ...................................................................................... 35–36

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................................................................ 11, 15

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) ........................................................................ 22, 41

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................ 10, 12, 14, 18

*Coal. to Preserve the Integrity of Am. Trademarks v. United States*,
790 F.2d 903 (D.C. Cir. 1986) ............................................................................. 44

*Cohens v. Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ............................................................................. 41

*Cont'l Bank & Tr. Co. v. Martin*,
303 F.2d 214 (D.C. Cir. 1962) ............................................................................. 42

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009) ................................................................... 9, 26–27

*Eccles v. Peoples Bank of Lakewood Village*,
333 U.S. 426 (1948) ...................................................................................... 41–42

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ............................................................................... 9

*FBI v. Fikre*,
601 U.S. 234 (2024) ...................................................................................... 20, 25

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996) ............................................................................. 45

*Food & Water Watch, Inc. v. Vilsack*,
79 F. Supp. 3d 174 (D.D.C. 2015),
*aff'd*, 808 F.3d 905 (D.C. Cir. 2015) ................................................................. 17

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ............................................................................... 8

*Georgetown Univ. Hosp. v. Bowen*,
821 F.2d 750 (D.C. Cir. 1987),
*aff'd*, 488 U.S. 204 (1988) .......... 27

*Girouard v. United States*,
328 U.S. 61 (1946) .......... 44

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987) .......... 9

*Jerome Stevens Pharms., Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) .......... 8

**Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021) .......... *passim*

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) .......... 30

*Kiakombua v. Wolf*,
498 F. Supp. 3d 1 (D.D.C. 2020), *appeal dismissed*, No. 20-5372,
2021 WL 3716392 (D.C. Cir. July 19, 2021) .......... 24

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281 (1988) .......... 44

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) .......... 8, 30

*Laird v. Tatum*,
408 U.S. 1 (1972) .......... 12

*Land v. Dollar*,
330 U.S. 731 (1947) .......... 9

**Larson v. Valente*,
456 U.S. 228 (1982) .......... 22–23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 41

**Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 8, 10, 22

**Massachusetts v. EPA*,
549 U.S. 497 (2007) .......... 23

*Missouri v. McNeely*,
569 U.S. 141 (2013) .......... 40

**Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 18

*Mountain States Legal Found. v. Glickman*,
92 F.3d 1228 (D.C. Cir. 1996) ............................................................ 17, 23

*Murthy v. Missouri*,
603 U.S. 43 (2024) .................................................................................... 13

*Nat. Res. Def. Council, Inc. v. EPA*,
824 F.2d 1146 (D.C. Cir. 1987) ............................................................... 44

*Nat'l Mining Ass'n v. Dep't of the Interior*,
251 F.3d 1007 (D.C. Cir. 2001) ............................................................... 27

*In re Navy Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012) ............................................................... 14

**Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) ............................................................................ 25–26

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .................................................................................. 11

*Pan Am. World Airways, Inc. v. Boyd*,
207 F. Supp. 152 (D.D.C. 1962)................................................................ 42

*Payne Enters., Inc. v. United States*,
837 F.2d 486 (D.C. Cir. 1988) ................................................................. 43

*Planned Parenthood of Wis., Inc. v. Azar*,
942 F.3d 512 (D.C. Cir. 2019) ............................................................ 25–26

**Riley v. California*,
573 U.S. 373 (2014) ...........................................................................*passim*

*Scenic Am., Inc. v. Dep't of Transp.*,
836 F.3d 42 (D.C. Cir. 2016) ............................................................. 23–24

*Skinner v. Switzer*,
562 U.S. 521 (2011) .................................................................................. 29

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) .................................................................................... 41

*Stanford v. Texas*,
379 U.S. 476 (1965) ........................................................................ 3, 36–37

*Steagald v. United States*,
451 U.S. 204 (1981) ........................................................................ 3, 36, 40

*Steffel v. Thompson*,
415 U.S. 452 (1974) .................................................................................. 14

*Super Tire Eng'g Co. v. McCorkle*,
416 U.S. 115 (1974) .................................................................................. 43

**Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 10, 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 11

*Tuan Anh Nguyen v. INS*,
533 U.S. 53 (2001) .......... 33, 39

*United States v. Aigbekaen*,
943 F.3d 713 (4th Cir. 2019) .......... 32–33

*United States v. Alisigwe*,
No. 24-960, 2026 WL 2751713 (2d Cir. Sep. 17, 2026).......... 32–33, 38–39

*United States v. Belmonte Cardozo*,
181 F.4th 461 (4th Cir. 2026).......... 31–32

**United States v. Cano*,
934 F.3d 1002 (9th Cir. 2019) .......... 31–33

*United States v. Flores-Montano*,
541 U.S. 149 (2004) .......... 34, 36–38

*United States v. Gaubert*,
499 U.S. 315 (1991) .......... 8

*United States v. Gurr*,
471 F.3d 144 (D.C. Cir. 2006) .......... 38

**United States v. Kim*,
103 F. Supp. 3d 32 (D.D.C. 2015), *appeal dismissed*,
No. 15-3035, 2015 WL 5237696 (D.C. Cir. Aug. 14, 2015).......... 34, 38

**United States v. Kolsuz*,
890 F.3d 133 (4th Cir. 2018) .......... 19, 31–32

*United States v. Montoya de Hernandez*,
473 U.S. 531 (1985) .......... 34

**United States v. Ramsey*,
431 U.S. 606 (1977) .......... 34, 36–37

*United States v. Saboonchi*,
990 F. Supp. 2d 536 (D. Md. 2014) .......... 19

*United States v. U.S. Dist. Ct. (Keith)*,
407 U.S. 297 (1972) .......... 45

*United States v. Vergara*,
884 F.3d 1309 (11th Cir. 2018) .......... 34

*Vill. of Elk Grove Vill. v. Evans*,
997 F.2d 328 (7th Cir. 1993) .......... 23

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 22, 40–41

*Wyoming v. Houghton*,
526 U.S. 295 (1999) .......... 39

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012) .......... 44

*Zuber v. Allen*,
396 U.S. 168 (1969) .......... 44

**Statutes**

5 U.S.C. § 552(b)(7)(E) .......... 5

5 U.S.C. § 704 .......... 4, 8

5 U.S.C. § 706(2)(B) .......... 41, 45

6 U.S.C. § 211(k)(1)(A) .......... 43

6 U.S.C. § 211(k)(4) .......... 43

6 U.S.C. § 211(k)(5) .......... 43

19 U.S.C. § 482 .......... 37

Act of July 31, 1789, ch. 5, § 24, 1 Stat. 29 .......... 36

**Other Authorities**

CBP Directive No. 3340-049A, "Border Search of Electronic Devices" (Jan. 2018), https://perma.cc/G8YH-5LZ4 .......... *passim*

CBP Directive No. 3340-049B, "Border Search of Electronic Devices" (Jan. 2026), https://www.cbp.gov/sites/default/files/2026-01/cbp_directive_3340-049b_jan_2026_508.pdf, *archived at* https://perma.cc/2HF2-YZSK .......... *passim*

DHS Off. of Inspector Gen., *CBP Continues to Experience Challenges Managing Searches of Electronic Devices at Ports of Entry*, OIG-21-63 (Sep. 23, 2021), www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-63-Sep21-Redacted.pdf .......... 39, 43

DHS Off. of Inspector Gen., *CBP Did Not Consistently Document and Track Searches of Electronic Devices at U.S. Ports of Entry as Required*, OIG-26-33 (Sep. 28, 2026), https://www.oig.dhs.gov/sites/default/files/assets/2026-09/OIG-26-33-Sep26-Redacted.pdf .......... 3, 17, 21, 43–44

DHS Off. of Inspector Gen., *CBP's Searches of Electronic Devices at Ports of Entry*, OIG-19-10 (Dec. 3, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-12/OIG-19-10-Nov18.pdf ........ 39, 43

ICE Directive No. 7-6.1 "Border Searches of Electronic Devices" (Aug. 2009), https://perma.cc/5DBR-SH8N ........ 6, 20–21, 32

Kerr, Orin S., *The Digital Fourth Amendment* (Oxford Univ. Press 2025) ........ 39

U.S. Customs & Border Prot., *Border Searches of Electronics at Ports of Entry: FY2025 Statistics*, CBP Pub. No. 5202-1025, https://www.cbp.gov/sites/default/files/2025-10/Border%20Search%20of%20Electronics%20at%20Ports%20of%20Entry%20FY%2025%20Stats.pdf (last visited Oct. 29, 2026). ........ 16

U.S. Customs & Border Prot., *CBP Releases Statistics on Electronic Device Searches* (Apr. 11, 2017), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-statistics-electronic-device-searches-0 ........ 16

U.S. Customs & Border Prot., *CBP Releases Updated Border Search of Electronic Device Directive and FY17 Statistics* (Jan. 5, 2018), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-updated-border-search-electronic-device-directive-and ........ 16

## INTRODUCTION

When Wilmer Chavarria came home in July 2025, border officials told him he had no Fourth Amendment rights at the border. Federal policies come close to making that true: they allow officers to search the contents of a citizen's phone, laptop, and tablet without a warrant or any suspicion. This suit challenges those policies and the directives that embody them.

Mr. Chavarria is a citizen and a school superintendent who, for fifteen years, has traveled abroad multiple times a year, mostly to visit his mother and other family members in Nicaragua. First Amended Complaint ("FAC") ¶¶ 1–2, 16. When he returned from Nicaragua in July 2025, officers at Houston's international airport isolated him for hours, saying he was suspicious for refusing to provide passwords to his devices. Once he relented, they searched his phone, laptop, and tablet outside his presence. *Id.* ¶¶ 3–6. CBP's records, released under the Freedom of Information Act, show that a supervisor approved an "electronic media exam" of his devices. *Id.* ¶ 8. Mr. Chavarria has traveled to Nicaragua six times since, each time without his phone, laptop, or tablet. *Id.* ¶ 52; Decl. of Wilmer Chavarria ("Chavarria Decl.") ¶¶ 6–7. He asks the Court to set aside the directives under which he was searched and under which he remains subject to search every time he returns: the CBP and ICE directives authorizing warrantless, suspicionless searches of the contents of travelers' electronic devices. *Id.* ¶¶ 50, 57, 59; *id.* at Prayer for Relief ¶¶ A–C.

The government's motion to dismiss appears to address a different case, eliding three points.

First, Mr. Chavarria's claim does not ask the Court to require a warrant "for all searches of electronic devices." MTD 1. Exceptions such as exigency remain available, *see Riley v. California*, 573 U.S. 373, 401–02 (2014), and the 2026 Directive doesn't govern an officer's check of whether a device works or conceals physical contraband, 2026 Directive § 2.4. What Mr. Chavarria challenges are rules that let officers read a citizen's digital papers for no reason at all. FAC ¶¶ 56–57.

Second, the policies authorize what the motion describes as constraints on authority. MTD 18. The 2026 Directive permits a "basic" search "with or without suspicion," § 5.1.3, defining the category to include connecting external equipment to "bypass a password" or "overcome encryption," § 3.4. It permits a forensic "advanced" search "in the absence of individualized reasonable suspicion when there is a national security concern," a term it nowhere defines. § 5.1.4; *see* FAC ¶¶ 36–37. And it obliges travelers to present their devices "in a condition that allows inspection of the device and its contents." 2026 Directive § 5.3.1.

Third, the harm Mr. Chavarria is suffering is not speculative. He has already been selected, detained, and searched, and CBP recorded the search, and the supervisory approval, in its own database. FAC ¶ 8. The directives apply to him every time he crosses the border. That he has not been searched again shows only that, since July 2025, he has carried none of his own devices. *Id.* ¶ 52. A plaintiff "is not required to wait for an injury to occur in order to satisfy Article III standing requirements." *Jibril v. Mayorkas*, 20 F.4th 804, 817 (D.C. Cir. 2021).

Stripped of those mischaracterizations, the motion comes down to two answers. The first is that device searches are rare. MTD 12. But the Fourth Amendment doesn't target the frequency of government searches. It is aimed at the power to search at an officer's discretion: the writs of assistance James Otis condemned for placing "the liberty of every man in the hands of every petty officer." *Stanford v. Texas*, 379 U.S. 476, 481 (1965); *see Steagald v. United States*, 451 U.S. 204, 220 (1981) (the "central objectionable feature" of general warrants and writs of assistance was that they "provided no judicial check"). The directives confer that power, so a citizen who values his papers' privacy must gamble on odds the agency controls. If these searches are rare, the government can do what the Constitution ordinarily requires: "get a warrant." *Riley*, 573 U.S. at 403.

The second is CBP's assurance that it "will protect the rights of individuals." MTD 15 (quoting 2026 Directive § 2.1). That is no reason for the Court to stand aside. Two days before the government filed its motion, the Department's Inspector General reported that CBP hadn't documented and tracked these searches as Congress requires. DHS Off. of Inspector Gen., *CBP Did Not Consistently Document and Track Searches of Electronic Devices at U.S. Ports of Entry as Required*, OIG-26-33 (Sep. 28, 2026), https://www.oig.dhs.gov/sites/default/files/assets/2026-09/OIG-26-33-Sep26-Redacted.pdf; *see infra* Part III.C.

Finally, the government no longer argues that the Administrative Procedure Act's adequate-remedy provision bars review,[1] and doesn't dispute that the APA supplies the vehicle for this challenge. It asks the Court instead to bar a citizen who's been searched once, and who is subject to search under a written policy every time he comes home, from challenging that policy. The motion should be denied.

## BACKGROUND

### A. The July 2025 Search

Mr. Chavarria came to the United States for college in 2008 and became a citizen in 2018. FAC ¶ 1. He now leads a school district and, for the past fifteen years, has traveled abroad multiple times a year, most frequently to Nicaragua to see his mother and other family. *Id.* ¶¶ 2, 16. On July 21, 2025, returning from Nicaragua through George Bush Intercontinental Airport in Houston, he was detained "for no given reason," the first time in fifteen years that he had been held for anything beyond a brief check of his immigration status. *Id.* ¶ 3.

Officers separated him from his husband, took him to an isolated secondary-screening area, and repeatedly pressed him to hand over his laptop, smartphone, and tablet, along with his passwords. *Id.* ¶ 4. When he objected, they told him he had no Fourth Amendment rights at the border and that he was behaving suspiciously by asserting them; they denied his requests to contact his family and a lawyer. *Id.*

[1] The government's first motion argued that 5 U.S.C. § 704 bars Mr. Chavarria's APA claim because he could sue directly under the Fourth Amendment. ECF No. 15 at 27–29. Mr. Chavarria contested that reading of § 704, ECF No. 16 at 40–41, noting the Fifth Circuit had declined to affirm a dismissal on that ground, *Anibowei v. Bondi*, No. 24-11042, 2025 WL 3231720, at *1 n.2 (5th Cir. Nov. 19, 2025).

Mr. Chavarria's chief concern was the student data on his devices, though his personal phone also held his own communications and records. *Id.* ¶ 5. After hours of isolation, physical discomfort, and pressure—including one officer's suggestion that refusing to give up his passwords could affect his job—he handed over the devices and passwords. *Id.* Officers searched the devices outside his presence for what he estimates was at least two hours. *Id.* ¶ 6 & n.1. He does not know what they viewed or copied. *Id.* ¶ 6.

In February 2026, a FOIA request seeking records of the detention and search produced two heavily redacted documents from CBP. *Id.* ¶ 8. One, a "TECS – Electronic Media Report," states that "a (b)(7)(E) electronic media exam of CHAVARRIA's electronics was requested" and that the request "was approved by Supervisor." *Id.* The redactions under 5 U.S.C. § 552(b)(7)(E) cover techniques and procedures for law-enforcement investigations. *Id.* ¶ 9. Because the directive then in effect required supervisory approval for advanced (forensic) searches, but not for basic ones, Mr. Chavarria alleges on information and belief that his devices were searched forensically. *Id.* ¶¶ 10, 25; 2018 Directive § 5.1.4.

### B. The Directives

*The 2018 CBP Directive.* From January 2018 through 2025, CBP's device searches were governed by Directive No. 3340-049A (the "2018 Directive"). FAC ¶ 23. It allowed an officer to conduct a basic search of a device "with or without suspicion." 2018 Directive § 5.1.3; FAC ¶ 24. It allowed an advanced search, in which an officer connects external equipment to "review, copy, and/or analyze" a device's contents, where there was "reasonable suspicion of activity in violation of the laws enforced or

administered by CBP, or in which there is a national security concern," with supervisory approval. 2018 Directive § 5.1.4; FAC ¶ 25. It allowed CBP to detain devices and to retain information under a series of exceptions, none involving judicial review. FAC ¶¶ 26–27. And it provided that when CBP conveys a device or its contents to ICE, the conveyance "is not limited by the terms of this Directive, and ICE policy will apply." 2018 Directive § 2.7; FAC ¶ 31.

*The ICE Directive.* ICE's 2009 directive (Directive No. 7-6.1) does not distinguish basic from advanced searches. FAC ¶¶ 32–33. It authorizes ICE Special Agents to "search, detain, seize, retain, and share electronic devices, or information contained therein, with or without individualized suspicion." ICE Directive § 6.1. And it provides that searches under it may be performed not only by ICE Special Agents but also by "another properly authorized officer with border search authority, such as a CBP Officer or Border Patrol Agent." *Id.* § 8.1.1; *see* FAC ¶ 34.

*The 2026 CBP Directive.* On January 1, 2026, a few weeks after this suit was filed, Directive No. 3340-049B (the "2026 Directive") took effect and is said to have superseded the 2018 Directive. 2026 Directive at 1, § 11.1; FAC ¶ 35. The 2026 Directive keeps the basic-search rule word for word: an officer "may conduct a basic search of an electronic device with or without suspicion." 2026 Directive § 5.1.3; *see* MTD 26. A basic search is any review or analysis of information on the device short of an advanced search, and it may include recording what the officer sees in CBP systems. 2026 Directive § 3.3. Using external equipment "merely to make the contents of the device available for inspection," including "to bypass a password,

overcome encryption, translate content, [or] view files," does not make a search advanced. *Id.* § 3.4; FAC ¶ 37.

The 2026 Directive allows advanced searches on reasonable suspicion "or, in the absence of individualized reasonable suspicion when there is a national security concern." 2026 Directive § 5.1.4; FAC ¶ 36. It doesn't define a national security concern or say what facts must support one. 2026 Directive § 5.1.4. The Directive requires travelers "to present electronic devices and the information contained therein in a condition that allows inspection of the device and its contents," *id.* § 5.3.1, otherwise the device "may be subject to exclusion, detention, or other appropriate action," *id.* § 5.4.1. It allows CBP to retain information without probable cause if it relates to "immigration, customs, and other enforcement matters," *id.* § 5.6.2, and to share it with federal, state, local, tribal, territorial, and foreign law enforcement, *id.* § 5.8.1. Finally, like its predecessor, it provides that when CBP conveys a device or its contents to Homeland Security Investigations ("HSI"), ICE's investigative component, the conveyance "is not limited by the terms of this Directive." *Id.* § 2.8; FAC ¶ 38.

### C. Mr. Chavarria's Travel Since the Search

Mr. Chavarria intends to keep visiting his family in Nicaragua and to travel for work and other reasons. FAC ¶ 11; Chavarria Decl. ¶ 11. On his eight trips abroad since the search, six to Nicaragua, he left his phone, laptop, and tablet at home to avoid another encounter like the one in July 2025. FAC ¶ 52; Chavarria Decl. ¶¶ 6–7. Leaving his devices behind has made it more difficult for him to work remotely and

to stay in touch with family and friends while traveling. FAC ¶¶ 51, 53; Chavarria Decl. ¶ 10.

### D. Procedural History

Mr. Chavarria filed this action in December 2025. ECF No. 1. The government moved to dismiss on April 24, 2026, arguing among other things that 5 U.S.C. § 704 barred his APA claim. ECF No. 15 at 27–29. After briefing on that motion was complete, ECF Nos. 16, 19, Mr. Chavarria filed the First Amended Complaint on July 2, 2026, adding a challenge to the 2026 Directive and allegations about the July 2025 encounter, the FOIA records, and his travel since. ECF No. 21. The government filed the present motion on September 30, 2026. ECF No. 25.

## LEGAL STANDARD

On a motion under Rule 12(b)(1), the Court "must . . . accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (alteration in original) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)). A plaintiff need only "state a plausible claim" that each element of standing is present, *Attias v. CareFirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017), and "general factual allegations of injury resulting from the defendant's conduct may suffice," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Where facts that would sharpen an allegation are in the government's hands, the plaintiff may plead on information and belief, so long as he states the facts on which the belief rests. *Jibril*, 20 F.4th at 816 (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)).

The government correctly notes that the Court may look beyond the pleadings to decide its jurisdiction. MTD 7 (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997)). That principle runs in both directions. The Court "may inquire by affidavits or otherwise, into the facts as they exist," *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947), and doing so does not convert the motion into one for summary judgment, *Haase v. Sessions*, 835 F.2d 902, 905–06 (D.C. Cir. 1987). The motion goes outside the complaint, relying on CBP statistics from fiscal year 2017 and on figures another court noticed more than a decade ago. MTD 11–12. To the extent the motion thereby mounts a factual challenge regarding jurisdictional questions under Rule 12(b)(1), Mr. Chavarria submits a declaration addressing his travel since July 2025, what he has carried on each trip, his plans for future travel, and the cost of leaving his devices behind. Chavarria Decl. ¶¶ 6–7, 10–11. The D.C. Circuit has credited such a declaration of a plaintiff's future plans when the government offered nothing to contradict it. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009).

On a motion under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Rule 8 does not require "detailed factual allegations," *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 555), and it does not require a plaintiff to plead what only the defendant knows. *See Jibril*, 20 F.4th at 816.

## ARGUMENT

## I. The Court Has Jurisdiction

### A. Mr. Chavarria Has Standing to Seek Prospective Relief Against the Directives

The government's standing argument treats the search of Mr. Chavarria as a fluke: a traveler searched once, by chance, with no more reason than anyone else to expect it again. MTD 9–14. But where, as here, the plaintiff "is himself an object of the action (or forgone action) at issue," there is "ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. The directives govern what may be done to travelers' devices. They oblige travelers to present their devices "in a condition that allows inspection of the device and its contents," 2026 Directive § 5.3.1, on pain of "exclusion, detention, or other appropriate action," *id.* § 5.4.1. And they've already been applied to Mr. Chavarria's phone, laptop, and tablet. FAC ¶¶ 4–8.

A plaintiff seeking prospective relief must show that the threatened injury is "certainly impending," or that there's a "substantial risk" that the harm will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). A substantial risk may also "prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm," *Clapper*, 568 U.S. at 414 n.5, and those costs are themselves an injury. Here, Mr. Chavarria faces a substantial risk that his devices will be searched again under the directives

(Parts I.A.1–2), and the precautions he has taken against that risk are a present, concrete injury, not a self-inflicted one (Part I.A.3). Because the same injury supports each form of relief he seeks—a declaration, vacatur, and an injunction—*TransUnion*'s requirement that standing be shown "for each form of relief" is satisfied. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

### 1. This case is unlike *Lyons* because the directives *are* the authorization.

The government's lead authority is *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). MTD 9–10. But in that case, to present a live controversy, Lyons would have had to allege not only another encounter with the police, but also either that Los Angeles officers "always choke any citizen with whom they happen to have an encounter," or "that the City ordered or authorized police officers to act in such manner." 461 U.S. at 105–06. He could do neither, because the city's policy permitted chokeholds only against resistance or escape, so any repetition depended on his own conduct or on officers' disobeying instructions. *Id.* at 106. Here, by contrast, a written policy, the 2026 Directive, permits an officer to search the contents of any traveler's devices "with or without suspicion." 2026 Directive § 5.1.3. Nothing depends on Mr. Chavarria's or an officer's misconduct. And *Lyons* reaffirmed that past exposure, while not sufficient, is evidence "bearing on whether there is a real and immediate threat of repeated injury." 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

The same point answers the government's assertion that Mr. Chavarria "has never been subject to the 2026 directive he now challenges," MTD 1; *see id.* at 19, and

its claim that his avoidance reflects only a "subjective 'chill,'" *id.* at 13 (quoting *Clapper*, 568 U.S. at 418). A directive that governs every border crossing applies to him each time he crosses. That is why he leaves his devices at home. FAC ¶ 52; Chavarria Decl. ¶¶ 6–7, 9. The very case *Clapper* quoted distinguished cases in which "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see Clapper*, 568 U.S. at 419 (distinguishing a policy "that does not regulate, constrain, or compel any action on [the plaintiffs'] part"). Mr. Chavarria challenges a compulsory search power that has already been exercised against him and that, at every crossing, requires him to make his devices and their contents available for inspection. 2026 Directive §§ 5.3.1, 5.4.1.

Nor does it matter that the July 2025 search took place under the 2018 Directive. The First Circuit decided a facial challenge to CBP's 2018 Directive brought by travelers most of whom had been searched under its 2009 predecessor. *Alasaad v. Mayorkas*, 988 F.3d 8, 12–14 (1st Cir. 2021).[2] A traveler searched under one version of a policy may challenge the version governing his next crossing. Any other rule lets agencies defeat review by reissuing directives. *See infra* Part I.D.

---

[2] The government did not challenge the plaintiffs' standing on appeal in *Alasaad*, 988 F.3d at 15 n.5. The district court addressed the 2018 directive because the plaintiffs sought prospective relief and it had superseded the 2009 version. *Alasaad v. Nielsen*, No. 17-cv-11730-DJC, 2018 WL 2170323, at *3 (D. Mass. May 9, 2018).

*Murthy v. Missouri*, 603 U.S. 43 (2024), doesn't help the government. *See* MTD 9–10. The question there was whether social-media platforms, which are third parties, would restrict the plaintiffs' future speech because of past government pressure. *Murthy*, 603 U.S. at 57–60. Here, no third party stands between the policy and the injury: the defendants conduct the searches themselves under their own directives. And the "past events" Mr. Chavarria alleges, MTD 10, show how the directives operate in practice and why his precautions are reasonable. *See* FAC ¶ 4.

**2. Mr. Chavarria faces a substantial risk of another search.**

Mr. Chavarria is not, as the government would have it, a random member of a traveling public numbering in the hundreds of millions. MTD 12. He has traveled abroad multiple times a year for fifteen years, and intends to keep doing so. FAC ¶¶ 2, 11; Chavarria Decl. ¶¶ 3, 11. He has already been selected for secondary inspection and a device search, in which officers treated his assertion of his rights as suspicious. FAC ¶¶ 3–4. And CBP recorded that search, together with a supervisor's approval of an "electronic media exam," in TECS, its own law-enforcement database. *Id.* ¶ 8.

That is the posture in which the D.C. Circuit found standing in *Jibril v. Mayorkas*. The plaintiffs there had been subjected to extensive screening on a prior trip, alleged a history and plan of international travel, and could not learn their watchlist status. 20 F.4th at 814–17. The court presumed that their status remained the same because "[a]ny information to the contrary is within the Government's exclusive control, and we must draw all reasonable inferences in the Jibrils' favor at this stage of the litigation." *Id.* at 808. It called the government's reliance on the family's earlier incident-free travel "a specious argument." *Id.* at 816. And it noted

the government had no "plans to change the procedures alleged to injure plaintiffs." *Id.* at 817 (quoting *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012)). Similarly, what CBP's records show about Mr. Chavarria, and how its officers use them, is within the government's control. The government relies on his fifteen years of uneventful travel, MTD 10, just as in *Jibril*. And far from planning to change the challenged policies, CBP reissued them in January 2026, keeping (and arguably broadening) the suspicionless basic search category and making suspicionless advanced searches express. 2026 Directive §§ 5.1.3, 5.1.4.

"Past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony List*, 573 U.S. at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). In the same passage, the Supreme Court contrasts *Clapper*, where the plaintiffs' theory was "substantially undermine[d]" by their failure to show that they had ever been surveilled. *Id.* (quoting *Clapper*, 568 U.S. at 411). Here, Mr. Chavarria has been searched, under the policy he challenges, by the agency he sues.

The government stresses that his devices have been searched only once and that the amended complaint doesn't allege subsequent referrals to secondary inspection. MTD 10, 13. But he's carried none of his own devices on any trip since July 2025, only a district-issued backup phone. FAC ¶ 52; Chavarria Decl. ¶¶ 6–7. The absence of another device search reflects his precautions, not the absence of risk. The government's position, in substance, is that he must carry his devices, and be searched again, before he may sue. The D.C. Circuit rejected the same suggestion in

*Jibril*, where government counsel proposed that the family "book another trip" to find out whether they would again be screened. Whether that was "a tongue-in-cheek quip or simply a heartless argument," the court said, "[a] plaintiff is not required to wait for an injury to occur in order to satisfy Article III standing requirements." 20 F.4th at 817. In litigation over the same policies, the government did not dispute that five plaintiffs' devices were searched more than once. *Alasaad v. Nielsen*, 419 F. Supp. 3d 142, 148–49 (D. Mass. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021).

In *Alasaad*, 2018 WL 2170323, at *9–11, the court held that there is "no numerical threshold" at which a likelihood of harm becomes a substantial risk, and that some 30,000 device searches a year is "not a 'rare occurrence.'" *Id.* at *9. It distinguished *Lyons* because the plaintiffs challenged "recurring conduct authorized by official policies" that are "in place and are being actively enforced." *Id.* at *10. And it held that travelers need not allege particular travel dates, because exposure to the policies requires only that they travel abroad and return. *Id.* at *10–11.

The government's statistics don't change the analysis. First, these statistics are population-wide base rates. They say nothing about the odds facing a traveler who's already been selected, searched, and recorded in CBP's database. *Jibril* declined to rely on a government statistic for that reason, finding it "devoid of any meaningful context" because it didn't show how travelers who'd been treated like the plaintiffs would fare. 20 F.4th at 815–16. Second, the government's figures are old. Its per-traveler rate comes from fiscal year 2017, MTD 12, and *Abidor*'s "one in a

million" estimate came from a 2006 CBP figure that court noticed, *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 271 & n.4 (E.D.N.Y. 2013). On the government's own theory of judicial notice, MTD 12, the Court may notice CBP's current figures, which show device searches rising far faster than travel: from 8,503 in fiscal year 2015, and about 30,200 in fiscal year 2017, the year the government cites, to 55,318 in fiscal year 2025, including 4,396 advanced searches, while the number of arriving travelers grew by less than 10 percent.[3] The per-traveler search rate has risen roughly sixfold since fiscal year 2015, and has nearly doubled since the year the government cites. Third, CBP's own figures show 13,590 searches of U.S. citizens' devices in fiscal year 2025 alone.

*Abidor*, the government's principal case, MTD 11–12, 14–15, is distinguishable on its facts. There, the plaintiff kept traveling with his computer and was stopped twice more without any search, 990 F. Supp. 2d at 274–75; Mr. Chavarria has had to stop traveling with his devices. And *Abidor* assumed that searches would remain rare, cautioning that "if suspicionless forensic computer searches at the border threaten to become the norm, then some threshold showing of reasonable suspicion

[3] U.S. Customs & Border Prot., *CBP Releases Statistics on Electronic Device Searches* (Apr. 11, 2017), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-statistics-electronic-device-searches-0; U.S. Customs & Border Prot., *CBP Releases Updated Border Search of Electronic Device Directive and FY17 Statistics* (Jan. 5, 2018), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-updated-border-search-electronic-device-directive-and; U.S. Customs & Border Prot., *Border Searches of Electronics at Ports of Entry: FY2025 Statistics*, CBP Pub. No. 5202-1025, https://www.cbp.gov/sites/default/files/2025-10/Border%20Search%20of%20Electronics%20at%20Ports%20of%20Entry%20FY%2025%20Stats.pdf (last visited Oct. 29, 2026).

should be required." *Id.* at 282. The 2026 Directive now authorizes suspicionless forensic searches. 2026 Directive § 5.1.4. Moreover, *Abidor* predates *Riley*.

The gravity of the threatened injury also matters: "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996); *accord Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 189 (D.D.C. 2015), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015). A search of a phone's contents—which commonly include extensive personal information—is among the gravest. *See Riley*, 573 U.S. at 396–97.

Finally, the government argues that Mr. Chavarria alleges no facts suggesting he would "ever present a national security concern." MTD 13. But the 2026 Directive does not define a national security concern or say what facts must support one. 2026 Directive § 5.1.4. Whether a traveler "presents" one is decided by the officer, subject to approval by an official "or their delegate," or, in "compelling circumstances," by no one in advance. *Id.* CBP's Inspector General recently found an advanced search conducted on a mere reference to "national security concerns," with no articulated facts. OIG-26-33, at 4. In any event, Mr. Chavarria's standing does not depend on which provision an officer would invoke. The basic search provision applies to every traveler, without suspicion, 2026 Directive § 5.1.3, and it covers equipment-assisted access to, among other things, locked and encrypted contents, *id.* § 3.4. The claim challenges warrantless, suspicionless searches of a device's contents, whichever provision authorizes them. FAC ¶ 57.

### 3. Mr. Chavarria's precautions are not self-inflicted injury.

The government's remaining argument is that leaving his devices at home is a "self-inflicted" harm under *Clapper*. MTD 13–14. *Clapper* held that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." 568 U.S. at 416. Costs incurred to avoid a substantial risk, however, are a different matter, as *Clapper* itself recognized. *Id.* at 414 n.5. In *Monsanto Co. v. Geertson Seed Farms*, the Court held that farmers' precautions against a "substantial risk" of gene flow were harms "which respondents will suffer even if their crops aren't actually infected," and were "sufficiently concrete to satisfy the injury-in-fact prong." 561 U.S. 139, 153–55 (2010). The D.C. Circuit draws the same line: risk-mitigation costs become cognizable "when combined with a risk of future harm that is substantial enough to qualify as an injury in fact." *Attias*, 865 F.3d at 629 (quoting *Clapper*, 568 U.S. at 414 n.5, 416). Because Mr. Chavarria faces a substantial risk of another search (Part I.A.2), the costs incurred when taking reasonable precautions to avoid it are an injury in fact.

*Clapper*'s facts confirm the difference. The plaintiffs there couldn't show that they had ever been surveilled, and their theory required a chain of contingencies: the government would have to target their foreign contacts, choose to rely on the challenged statute, and obtain approval from the Foreign Intelligence Surveillance Court—and the surveillance would have to successfully capture the plaintiffs' own communications. *See Attias*, 865 F.3d at 626, 628 (describing *Clapper*'s chain of "independent decisionmakers"). Here, "[n]o long sequence of uncertain contingencies involving multiple independent actors has to occur." *Id.* at 629. There is one actor,

the defendant agency, acting under its own directives, and it's already searched Mr. Chavarria once. The directives authorize searches of Mr. Chavarria himself, and nothing stands between an officer and that search but the officer's choice.

Leaving his devices behind is also what any reasonable person would do in his position. Mr. Chavarria was held in isolation for hours, told that he had no Fourth Amendment rights, denied contact with his family and a lawyer, and had his devices searched outside his presence. FAC ¶¶ 3–6. One officer described another detainee's device contents to him in revealing detail. *Id.* ¶ 52. And the costs of avoidance are real. Courts have recognized that it is neither "realistic nor reasonable to expect the average traveler to leave his digital devices at home when traveling." *United States v. Kolsuz*, 890 F.3d 133, 145 (4th Cir. 2018) (quoting *United States v. Saboonchi*, 990 F. Supp. 2d 536, 556 (D. Md. 2014)). Mr. Chavarria can no longer work from his own devices while visiting his family; his school district has had to purchase a separate workstation, kept in Nicaragua, so that he can work remotely there. Chavarria Decl. ¶ 10. And he cannot stay in touch with family, friends, and colleagues, or use his phone for navigation, banking, or photographs while traveling, as he otherwise would. FAC ¶¶ 51, 53; Chavarria Decl. ¶ 10. Carrying a district-issued backup phone with only emergency contact information and basic travel applications, instead of his own phone, Chavarria Decl. ¶ 7, is another cost the directives impose on Mr. Chavarria. The Supreme Court recently treated the same kind of avoidance as real,

noting that a plaintiff challenging his watchlist status might be refraining from activity "for fear of finding himself relisted." *FBI v. Fikre*, 601 U.S. 234, 243 (2024).[4]

**B. Mr. Chavarria Has Standing to Challenge the ICE Directive**

The government argues that Mr. Chavarria lacks standing to sue ICE because the records he obtained are CBP's and the only agency insignia he alleges seeing during his encounter was a CBP badge. MTD 16. That argument assumes that searches under the ICE Directive are conducted only by people with ICE badges. But the ICE Directive authorizes border searches of electronic devices to be performed by "an ICE Special Agent" or by others "with border search authority, such as a CBP Officer or Border Patrol Agent." ICE Directive § 8.1.1; *see* FAC ¶ 34. A CBP badge says nothing about which directive governed a search.

The CBP directives also build ICE into the process. When CBP conveys a device or copies of its contents to HSI, "the conveyance to HSI is not limited by the terms of this Directive, and HSI policy will apply." 2026 Directive § 2.8; *accord* 2018 Directive § 2.7 ("ICE policy will apply"). When CBP asks HSI for help with a search, HSI "may use their concurrently held border search authority." 2026 Directive § 2.8. CBP may convey devices or copies for technical assistance "with or without suspicion," *id.* § 5.5.2, and it may decline to tell the traveler that it has done so, *id.* § 5.5.1.2. And the 2026 Directive narrowed its own coverage from searches "performed by or at the request of CBP," 2018 Directive § 2.7, to searches "performed by CBP," 2026 Directive

---

[4] Mr. Chavarria doesn't rely on the anonymous email to his school board, FAC ¶ 7, as an independent injury, but it bolsters his assertion that his decision to leave his devices behind when he travels is reasonable.

§ 2.8. Searches that CBP requests from HSI now fall outside CBP's directive and within ICE's policies.

Whether Mr. Chavarria's devices or data reached ICE in July 2025 is therefore something he cannot know, FAC ¶ 31 n.4, and something the government controls. CBP may withhold notice of a conveyance, 2026 Directive § 5.5.1.2, and the Inspector General reported last month that CBP had stopped tracking referrals of device information to other agencies. OIG-26-33, at 5. Mr. Chavarria cannot be faulted for failing to allege what only the government's own records would show. *See Jibril*, 20 F.4th at 816.

In any event, his standing to challenge the ICE Directive doesn't depend on what happened in July 2025. He seeks prospective relief, and the ICE Directive authorizes searches of travelers' devices "with or without individualized suspicion," without distinguishing basic from forensic searches. ICE Directive § 6.1; FAC ¶ 33. The government notes that the ICE Directive was "affected by guidance issued in 2018," MTD 19 n.4, but it doesn't explain how, and it doesn't contend that the suspicionless search authority in § 6.1 has changed. For the reasons given in Part I.A, Mr. Chavarria faces a substantial risk that the policies governing border searches of his devices will be applied to him when he crosses the border, and the precautions he takes respond to each directive, including the ICE Directive.

### C. A Favorable Decision Would Redress Mr. Chavarria's Injury

The government argues that vacating the directives would not redress Mr. Chavarria's injuries because "the Directives are not the source of the government's authority" to search devices at the border. MTD 17. That argument

addresses only one of the remedies Mr. Chavarria seeks. He also asks for a declaration that the defendants' policies authorizing warrantless, suspicionless searches of citizens' devices are unconstitutional, and for an injunction "prohibiting Defendants from performing warrantless searches of Plaintiff's electronic devices." FAC at Prayer for Relief ¶¶ A, C. The motion doesn't mention the injunction. An order directed to the agencies that conduct the searches redresses the threat of a search directly, whatever the source of their authority, and it would let Mr. Chavarria travel with his devices again. Chavarria Decl. ¶ 12. When the plaintiff is the object of the challenged action, there is "ordinarily little question . . . that a judgment preventing . . . the action will redress" his injury. *Lujan*, 504 U.S. at 561–62. And for purposes of standing, the Court "must . . . assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). Here, if Mr. Chavarria is right on the merits, the injunction he seeks would redress his injury.

Vacatur would also redress Mr. Chavarria's injuries. The directives may not be the ultimate source of border-search authority, but they are how the agencies exercise it. They define what officers may do to a traveler's devices, on what level of suspicion, and with whose approval, and officers "shall adhere" to them. 2026 Directive §§ 2.2, 5.1.3–5.1.4. A plaintiff "need not show that a favorable decision will relieve his every injury"; it is enough that the decision "will relieve a discrete injury to himself." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). In *Larson*, the State had invoked a single statutory rule as "the sole basis" for requiring the plaintiff church to

register, and the Court held that invalidating the rule would redress that injury even though the State might later require registration on other grounds. *Id.* at 242–43. Similarly, here the directives are the policies under which the agencies conduct suspicionless device searches. Setting them aside need not end every search; it is enough that the risk of an unconstitutional search "would be reduced to some extent." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). The same principle runs through the D.C. Circuit's increased-risk cases: even a small probability of injury suffices "provided of course that the relief sought would, if granted, reduce the probability." *Mountain States*, 92 F.3d at 1234–35 (quoting *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993)). And the government's own authority applies that rule to defendants. In *Ahmed v. Kable*, on which the government relies, MTD 20, the court held that an order reforming CBP's and DHS's policies "would substantially redress" a traveler's risk of repeated screening "by reducing that risk." No. 1:21-cv-03333 (TJK), 2023 WL 6215024, at *13 (D.D.C. Sep. 25, 2023).

*Scenic America, Inc. v. Department of Transportation*, 836 F.3d 42 (D.C. Cir. 2016), MTD 17, is not to the contrary. There, vacating federal guidance would have left the agency's field offices and the States free to approve the same billboards on other grounds, and the plaintiff offered no evidence at summary judgment that anyone would act differently. *Id.* at 50–53. Here no third party stands between the policy and the injury. The defendants conduct the searches themselves, under their own directives, and the relief runs against them. *Scenic America* also found redressability on the claim that would "repudiate" the agency's legal position, because

repudiation would bar the agency from relying on that position going forward. *Id.* at 55. A declaration that suspicionless searches of device contents violate the Fourth Amendment would do the same here.

Nor would vacatur "simply eliminate the internal limits the Directives place on border searches." MTD 18. The directives do more than limit officers; they impose obligations on travelers. Travelers "are obligated" to present their devices "in a condition that allows inspection," 2026 Directive § 5.3.1, and devices not so presented "may be subject to exclusion, detention, or other appropriate action," *id.* § 5.4.1. Vacatur would lift those obligations, not just the limits. Moreover, vacating an unconstitutional policy does not license unconstitutional conduct. Were this Court to vacate the directives, the agencies would remain bound by the Fourth Amendment and by the Court's declaration of the parties' rights. *See Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 56–57 (D.D.C. 2020), *appeal dismissed*, No. 20-5372, 2021 WL 3716392 (D.C. Cir. July 19, 2021) (rejecting DHS's argument that vacatur would leave "a vacuum on guidance"). On the government's logic, no agency policy authorizing unconstitutional conduct could ever be set aside, because the agency could always claim it might do even worse without it.

### D. The Challenge to the 2018 Directive Is Not Moot

The government argues that the challenge to the 2018 Directive is moot because the 2026 Directive superseded it, and that Mr. Chavarria lacks standing to challenge the 2026 Directive because it has not yet been applied to him. MTD 18–19. Part I.A answers the second half of that argument. The two halves together show what is wrong with the first. If a superseded policy cannot be challenged because it

was replaced, and its replacement cannot be challenged because it is new, an agency could escape review indefinitely by reissuing a substantially similar policy whenever it is sued. The Supreme Court has rejected that result. If a defendant could moot a case by changing course, it "might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off; it might even repeat 'this cycle' as necessary," and "a federal court's constitutional authority cannot be so readily manipulated." *Fikre*, 601 U.S. at 241.

The government bears the burden on mootness. *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019). A case is moot only when "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotation omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* And when a defendant alters the conduct it is sued over, it must show that the challenged behavior cannot "reasonably be expected to recur," a standard that "holds for governmental defendants no less than for private ones." *Fikre*, 601 U.S. at 241–42 (quotation omitted).

The government cannot carry that burden, because the challenged conduct is ongoing. The Supreme Court addressed this situation in *Northeastern Florida Chapter, Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). There, the city repealed the challenged ordinance and replaced it with one that differed in significant respects. *Id.* at 660–61. Still, the Court held the case wasn't moot: "[t]here is no mere risk that Jacksonville will repeat its allegedly

wrongful conduct; it has already done so." *Id.* at 662. It did not matter that the new ordinance differed from the old; otherwise "a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." *Id.* The new ordinance might disadvantage the plaintiffs "to a lesser degree," but it disadvantaged them "in the same fundamental way." *Id.*

So too here. The core claim is that the directives authorize searches of the contents of citizens' devices without a warrant and without suspicion. FAC ¶ 57; *id.* at Prayer for Relief ¶ A. The provision authorizing suspicionless basic searches is identical in both directives, as the government acknowledges. 2018 Directive § 5.1.3; 2026 Directive § 5.1.3; MTD 26. The other changes in the 2026 Directive concern how advanced searches are approved and documented and how data is handled afterward. *Compare* 2018 Directive §§ 5.1.4–5.1.5, 5.4–5.5, *with* 2026 Directive §§ 5.1.4–5.1.5, 5.6. None of these affect whether a citizen's phone may be searched without suspicion or a warrant. And the changes that matter run the other way. The 2026 Directive makes suspicionless advanced searches express, § 5.1.4, and it classifies equipment-assisted access to locked and encrypted contents as a basic search, § 3.4. Unlike *Jacksonville*, the replacement disadvantages Mr. Chavarria not "to a lesser degree," but arguably to a greater one.

The D.C. Circuit's ongoing-policy cases point the same direction. "[A] plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy." *Planned Parenthood*, 942 F.3d at 516 (quoting *Del Monte*, 570 F.3d at 321). The question is "whether the legal wrong complained of by the plaintiff is reasonably

likely to recur," not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur." *Del Monte*, 570 F.3d at 324. The legal wrong here is a warrantless, suspicionless search of a device's contents. Such searches continue to be performed regularly—and more frequently every year—under color of CBP's and ICE's directives.

The government's cases involved replacements that ended the challenged conduct—as opposed to replacements that *perpetuated* the conduct, as here. In *Akiachak Native Community v. Department of the Interior*, the agency rescinded the challenged provision outright, giving the challengers what they sought. 827 F.3d 100, 105–11 (D.C. Cir. 2016). Even then, the court described the cure: challenge "the regulation currently in force." *Id.* at 113. The amended complaint does exactly that. And *National Mining Ass'n v. Department of the Interior*, MTD 18, cuts against the government. On the same page the government cites, the court held a challenge to a superseded rule *not* moot because "the new version . . . is to the same effect," and decided it on the merits. 251 F.3d 1007, 1011 (D.C. Cir. 2001). The superseded rules it determined moot there had been replaced after "substantial changes." *Id.* Here, the challenged policy is unchanged, and the changes that were made do not cure it.

Finally, in this circuit, vacating a rule "ha[s] the effect of reinstating the rules previously in force." *Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983); *accord Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987) (vacatur of later rule "necessarily reinstated" earlier one), *aff'd*, 488 U.S. 204 (1988); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 85 (D.D.C. 2007). If the Court sets aside the

2026 Directive, the 2018 Directive—along with its authorization of suspicionless searches—would again govern. Relief against the 2018 Directive is therefore not "advisory." MTD 19.

## II. The Amended Complaint States a Fourth Amendment Claim

### A. The Claim Challenges Suspicionless Searches of Device Contents, and the Directives Authorize Them

The government's merits argument rests on a recharacterization of the claim. It says Mr. Chavarria contends that "every border search of an electronic device, basic or advanced, requires a warrant supported by probable cause," and that no court of appeals has adopted that rule. MTD 22; *see id.* at 1, 27. That's not the claim, and the difference is relevant to the Court's evaluation of the motion.

First, the claim doesn't reach every examination of a device. Recognized exceptions to the warrant requirement, such as exigent circumstances, remain available. *Riley*, 573 U.S. at 401–02; *see* 2026 Directive § 2.4 (preserving searches "in response to exigent circumstances"). An officer's check that a device works, or whether it conceals physical contraband, is not a search of its digital contents, and the 2026 Directive doesn't even govern it. 2026 Directive § 2.4. The claim concerns the review, analysis, copying, and retention of "the information in electronic or digital form contained" on a traveler's device. *Id.* § 2.3; *see* FAC ¶¶ 56–57.

Second, the claim challenges suspicionless searches, not only warrantless ones. The amended complaint challenges the defendants' "policies authorizing warrantless, suspicionless searches and seizures of electronic devices at the border," FAC ¶ 57, and seeks a declaration that the "policies authorizing warrantless, suspicionless

searches of U.S. citizens' electronic devices" are unconstitutional, *id.* at Prayer for Relief ¶ A. A complaint need not pin the plaintiff's claim to a precise legal theory. *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). So even if the Court were to conclude that the Fourth Amendment requires less than a warrant for some searches of device contents, the claim would survive as a challenge to the directives' authorization of searches with no suspicion at all. The government's assertion that Mr. Chavarria's "claim does not depend on . . . what level of suspicion is required for an advanced search," MTD 27, is wrong.

Third, the government is wrong that Mr. Chavarria "does not allege that the officers lacked reasonable suspicion." MTD 22. He alleges that he was detained "for no given reason," FAC ¶ 3, and that the searches to which he was subjected were "warrantless, suspicionless," *id.* ¶ 57. He cannot plead what was in the officers' minds. More fundamentally, the existence of suspicion in July 2025 is not an element of a challenge to the policies. The directives authorize suspicionless searches regardless. 2018 Directive § 5.1.3; 2026 Directive §§ 5.1.3, 5.1.4.

The government's treatment of the July 2025 search confirms the point. It calls the allegation that an advanced search occurred "speculative," because it rests on inferences from redacted records. MTD 21–22. But the examination was conducted outside Mr. Chavarria's presence, FAC ¶ 6, and the only account of it is in CBP's records, which CBP released with the type of exam redacted, *id.* ¶¶ 8–9. Pleading on information and belief is permitted "when the necessary information lies within defendants' control," so long as the allegations are "accompanied by a statement of

the facts upon which the allegations are based." *Jibril*, 20 F.4th at 816 (quoting *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021), and *Kowal*, 16 F.3d at 1279 n.3). The amended complaint supplies that statement: a TECS report recording a supervisor-approved "electronic media exam," and a directive that required supervisory approval for advanced searches but not basic ones. FAC ¶¶ 8–10; 2018 Directive § 5.1.4. The government cannot redact the record and then call the inference from it "speculative." Nor does supervisory approval show, as the government suggests, that the 2018 Directive's "safeguard" of reasonable suspicion was met. MTD 22. The 2018 Directive permitted an advanced search on reasonable suspicion "or" a "national security concern." 2018 Directive § 5.1.4. Approval shows only that a supervisor said yes. In any event, the claim does not depend on whether the July 2025 search was basic or advanced. The directives authorize suspicionless searches of either kind.

Properly understood, the claim challenges provisions that the government's own authorities do not support. Take the 2026 Directive's definition of a "basic" search. It includes connecting external equipment to "bypass a password, overcome encryption, translate content, [or] view files," 2026 Directive § 3.4, recording what the officer observes in CBP systems, *id.* § 3.3, and retaining information without probable cause, *id.* § 5.6.2. The Fourth Circuit recently explained why it treats manual phone searches as routine: a person, not a machine, does the looking; the search lasts only as long as the officer's time and attention; it "sees only what a user can access on a device"; and it leaves behind only an officer's memory or notes,

whereas "[a] forensic search does not end at the border crossing; it begins there." *United States v. Belmonte Cardozo*, 181 F.4th 461, 470–71 (4th Cir. 2026). The Directive's "basic" search fails each of those criteria. Even on the reasoning of courts that permit suspicionless manual searches, then, the Directive authorizes more than they have approved. *See* FAC ¶ 37.

Similarly, the 2026 Directive's national-security provision permits an advanced, forensic search "in the absence of individualized reasonable suspicion." 2026 Directive § 5.1.4. The Fourth Circuit holds that a forensic search "must be treated as nonroutine, permissible only on a showing of individualized suspicion." *Kolsuz*, 890 F.3d at 144; *accord Belmonte Cardozo*, 181 F.4th at 467. The Ninth Circuit requires reasonable suspicion that the phone "itself contains contraband." *United States v. Cano*, 934 F.3d 1002, 1020 (9th Cir. 2019). The government cites both circuits, MTD 24–25, yet defends a provision that doesn't meet their standards.

That is the answer to the government's claim that the directives "are consistent with the governing case law." MTD 26. Moreover, consistency with some out-of-circuit decisions doesn't make a policy constitutional in this one, and the D.C. Circuit hasn't decided the question. *See* MTD 22–23. CBP itself acknowledges that the governing rule varies: "[a]dditional or different requirements may apply in certain jurisdictions to ensure compliance with binding circuit precedent," and "[t]he location where the border search is initiated determines which policy guidance applies." 2026 Directive § 2.9. The ICE Directive itself is not consistent even with the government's own survey. It authorizes both manual and forensic searches of devices "with or without

individualized suspicion," ICE Directive § 6.1, and so authorizes forensic searches that *Kolsuz* and *Cano* forbid.[5]

**B. The Question Is Open in This Circuit, and the Circuits Are Divided**

The government describes the appellate decisions as "uniform," MTD 26, and says the circuits differ only on whether forensic searches require some suspicion, MTD 24–25. It omits what is arguably the most important division. Two circuits confine the border-search exception to the interests that justify it and hold that a search outside those interests requires a warrant. The Fourth Circuit holds that a nonroutine border search must be supported by suspicion of an offense bearing some nexus to the exception's purposes; a search that strays too far from those purposes "will be unconstitutional unless accompanied by a warrant or justified under a different exception to the warrant requirement." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019); *see Kolsuz*, 890 F.3d at 143; *Belmonte Cardozo*, 181 F.4th at 467–68. The Ninth Circuit limits forensic searches of phones to searches for digital contraband, and holds that border officials who want to search for evidence of crime can obtain a warrant. *Cano*, 934 F.3d at 1018–21. Neither circuit requires a warrant for every search of a device. Both hold that the border does not license a warrantless search of a device's contents for reasons unconnected to the border.

The Second Circuit's recent decision in *United States v. Alisigwe*, on which the government relies, MTD 21, 24, 26, deepens that division rather than resolving it. The majority held that the government "is not limited to searching for contraband or

[5] The government's footnote that the ICE Directive was "affected by guidance issued in 2018," MTD 19 n.4, does not say what the guidance is or how it changed § 6.1.

evidence of border offenses." No. 24-960, 2026 WL 2751713, at *2 (2d Cir. Sep. 17, 2026); *see id.* at *12–13. That is the opposite of *Aigbekaen* and *Cano*.

*Alisigwe* is also distinguishable on its facts. The district court there found reasonable suspicion, and the defendant did not challenge that finding on appeal. *Id.* at *18 n.1 (Lee, J., concurring in the judgment). The search was connected to the border: the defendant was suspected of using a fraudulent passport. *Id.* at *3. He was a lawful permanent resident with a pending naturalization application, and the majority tied its reading of *Riley* to the government's interest in determining whether he was entitled to enter. *Id.* at *8–9. That interest does not apply to a citizen, who has "the absolute right to enter" the country. *Id.* at *23 (Lee, J., concurring in the judgment) (quoting *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 67 (2001)). And the search was manual; the court reserved whether forensic searches are nonroutine. *Id.* at *3 n.1, *11 n.9. None of those facts is present here.

Nor is *Alisigwe* unanimous in its reasoning. Judge Lee, concurring in the judgment, explained that a phone "is not a suitcase," *id.* at *19; that searching one "is much closer on the spectrum to a strip search than it is to the search of luggage," *id.* at *21; and that unrestricted, suspicionless authority to search phones "is not a carefully-crafted exception to the Fourth Amendment" but "eliminates Fourth Amendment protections in this context," *id.* at *19. Judge Lee agreed that a warrant was not required on the facts before the court, *id.* at *18, but her opinion shows that the rule the government defends here, suspicionless searches of any traveler's phone,

continues to draw serious objection. *See, e.g.*, *United States v. Vergara*, 884 F.3d 1309, 1313–17 (11th Cir. 2018) (Jill Pryor, J., dissenting).

The Supreme Court has not yet addressed the question. Its border-search decisions involved vehicles, luggage, mail, and travelers' bodies, and all predate the smartphone. *See United States v. Flores-Montano*, 541 U.S. 149, 150–51 (2004); *United States v. Montoya de Hernandez*, 473 U.S. 531, 532–35 (1985); *United States v. Ramsey*, 431 U.S. 606, 608–10 (1977). The Court has declined to extend rules developed for physical objects to digital data. *Riley*, 573 U.S. at 393; *Carpenter v. United States*, 585 U.S. 296, 318 (2018). And it has now called for a response to a petition presenting the question. *Anibowei v. Blanche*, No. 26-208 (U.S. Sep. 29, 2026) (response requested).

The D.C. Circuit hasn't decided it either, as the government acknowledges. MTD 22–23. *Abdellatif v. DHS* addressed vague allegations of secondary inspections, involved no device search, and limited its holding to "airport security inspections as described in the government's declarations, or interviews at the border of reasonable length and conducted in good faith." 109 F.4th 562, 573 (D.C. Cir. 2024). The only decision in this district to address a border search of a device applied *Riley* and held the search unreasonable. *United States v. Kim*, 103 F. Supp. 3d 32, 59 (D.D.C. 2015), *appeal dismissed*, No. 15-3035, 2015 WL 5237696 (D.C. Cir. Aug. 14, 2015); *see infra* Part II.C. That the July 2025 search occurred in the Fifth Circuit, MTD 23, is beside the point; Mr. Chavarria challenges nationwide policies prospectively, and Fifth Circuit precedent does not bind this Court.

### C. The Border-Search Exception Does Not Extend to Reading a Traveler's Papers

The government's one-page answer to the claim's central premise says the Supreme Court "has never confined the border-search exception to dutiable goods or persons," and that academic commentary "cannot displace" the Court's precedents. MTD 25–26. But Mr. Chavarria's claim doesn't depend on confining the exception to dutiable goods, and it rests on the Supreme Court's own decisions. Two lines of analysis lead to the same place. The first asks what the Fourth Amendment protects: a phone's contents are the owner's papers and effects, and the border-search exception has never been held to license reading a traveler's papers. The second asks, as *Riley* requires, whether the reasons for the exception extend to the digital contents of a device. And they do not. The Supreme Court decisions that describe the government's border authority in sweeping terms all involved physical things: a gas tank, a traveler's body, envelopes searched for heroin. They were decided before smartphones existed, and none involved reading anyone's papers.

#### 1. The contents of a device are the owner's papers, and the border exception has never reached the reading of papers.

"Papers" are protected by the Fourth Amendment because what a person writes and keeps records his thoughts, his associations, and his affairs. *See Boyd v. United States*, 116 U.S. 616, 625–30 (1886). A phone is where most Americans now keep their papers. It holds "the privacies of life," *Riley*, 573 U.S. at 403 (quoting *Boyd*, 116 U.S. at 630), in such quantity that a search of it can reconstruct "the sum of an individual's private life," *id.* at 394. The Supreme Court recently described emails, documents, photographs, and calendars as private materials that "a user reasonably

views as his own," even when they're stored with a third party. *Chatrie v. United States*, 609 U.S. 605, 607 (2026); *see id.* at 644 (Gorsuch, J., concurring in the judgment) (analyzing these as Chatrie's "effects"). Even the dissenting Justices recognized that the Fourth Amendment protects "a person's security in . . . his own papers and effects." *Id.* at 659 (Alito, J., dissenting). The information on Mr. Chavarria's devices, disclosed to no one, falls within that core. FAC ¶ 56. Examining a phone's casing for concealed contraband treats it as an object crossing the border. Reading or viewing its contents treats it as what it is: the traveler's papers.

History confirms that the border-search power was never a power to read papers. The writs of assistance that the Fourth Amendment was adopted to forbid were customs instruments; they gave officials "blanket authority to search where they pleased for goods imported in violation of the British tax laws," and James Otis condemned them because they placed "the liberty of every man in the hands of every petty officer." *Stanford*, 379 U.S. at 481. Their "central objectionable feature" was that they "provided no judicial check" on the officer's decision to intrude. *Steagald*, 451 U.S. at 220. The First Congress's customs statute, on which the government relies for the exception's "impressive historical pedigree," MTD 2, 20 (quoting *Flores-Montano*, 541 U.S. at 153), authorized officers to search vessels in which they had "reason to suspect" concealment of "goods, wares or merchandise subject to duty." *Ramsey*, 431 U.S. at 616 (quoting Act of July 31, 1789, ch. 5, § 24, 1 Stat. 29, 43). And it "differentiated" that power from the "more limited power" to search "any particular

dwelling-house, store, building, or other place," for which a warrant "was required." *Id.* & n.12.

*Ramsey* itself, which the government invokes, MTD 26, shows the limit. The Court upheld the opening of international envelopes that customs officers had "reasonable cause to suspect" contained merchandise imported contrary to law. 431 U.S. at 611–15 (quoting 19 U.S.C. § 482). It did so in the context of governing regulations that "flatly prohibit[ed], under all circumstances, the reading of correspondence absent a search warrant." *Id.* at 623. The Court answered the dissent's concern about "wholesale, secret examination" of the mail by explaining that "the reading of letters is totally interdicted by regulation." *Id.* at 612 n.8 (responding to *id.* at 632 (Stevens, J., dissenting)). And it expressly reserved what the Fourth Amendment would require "in the absence of the regulatory restrictions." *Id.* at 624 n.18 (citing *Stanford*, 379 U.S. at 485). *Ramsey* approved opening an envelope—but only to look for heroin. And while the government is correct that the envelopes "could contain letters and other papers," MTD 26, that is the point: officers could open them but could not read the letters without a warrant. *See also Stanford*, 379 U.S. at 485–86 (noting the Fourth Amendment's particularity requirement "is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain," and distinguishing "weapons, narcotics or 'cases of whiskey'").

The government's other authorities do not erase that line. *Flores-Montano* concerned a vehicle's fuel tank; the Court held that "the reasons that might support

a requirement of some level of suspicion in the case of highly intrusive searches of the person . . . simply do not carry over to vehicles," and it reserved whether "some searches of property are so destructive as to require a different result." 541 U.S. at 152, 155–56. Nor does *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006), which held that customs officers may seize documentary evidence they find during a lawful search of luggage, not that they may read a citizen's papers without suspicion.

**2. *Riley*'s method leads to the same conclusion.**

Whether a warrant exception extends to a category of property depends on whether applying it "would untether the rule from the justifications underlying" it. *Riley*, 573 U.S. at 386. *Riley* refused to extend the search-incident-to-arrest exception to phones' contents, explaining that treating phones like other physical items in an arrestee's pockets "is like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Id.* at 393. *Carpenter* likewise declined to "uncritically extend existing precedents" to digital records. 585 U.S. at 318. In this district, *Kim* explained that *Riley* "made it clear that the breadth and volume of data stored on . . . smart devices make today's technology different in ways that have serious implications for the Fourth Amendment analysis," and it declined to treat a laptop as a mere "container." 103 F. Supp. 3d at 54–55. The government distinguishes *Kim* on its facts, MTD 22–23, but doesn't engage its reasoning.

Applied to a device's contents, the border exception's justifications fall away. The interest in collecting duties doesn't reach digital data, which isn't dutiable merchandise. The interest in determining admissibility does not reach a citizen, who has "the absolute right to enter" the country. *Alisigwe*, 2026 WL 2751713, at *23 (Lee,

J., concurring in the judgment) (quoting *Tuan Anh Nguyen*, 533 U.S. at 67). And the interest in intercepting contraband fits poorly, because "[d]igital data stored on a cellphone is not 'carried' across a border in any real sense." *Id.* at *22. Data on a phone can be sent across the border, or left in the cloud and retrieved from anywhere, with no border crossing at all. The 2026 Directive itself forbids officers to search information "that is solely stored remotely" and requires them to disconnect the device from networks. 2026 Directive § 5.1.2. A rule that depends on where data is stored—cloud versus device—rather than on whether anything is crossing the border is not serving a border interest. As Judge Lee put it, "[b]ecause searching [digital data] advances a criminal law enforcement interest, not a border concern, it should be treated under traditional Fourth Amendment rules." *Alisigwe*, 2026 WL 2751713, at *23 (Lee, J., concurring in the judgment) (quoting Orin S. Kerr, *The Digital Fourth Amendment* 123 (Oxford Univ. Press 2025)).

The remedy *Riley* prescribed is available here: "get a warrant." 573 U.S. at 403.[6] The exigent circumstances exception remains available. *Id.* at 402. And officers

---

[6] To the extent the Court balances the interests, *see Riley*, 573 U.S. at 385 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)), the balance points the same way. A search of a phone's contents exposes more than "the most exhaustive search of a house," *id.* at 396–97, while the government offers nothing to show that suspicionless searches of device contents serve border interests rather than general law enforcement. CBP's own Inspector General has reported that CBP lacks standards for evaluating the effectiveness of advanced searches and does not track whether device searches lead to prosecutions or convictions. DHS Off. of Inspector Gen., *CBP's Searches of Electronic Devices at Ports of Entry*, OIG-19-10, at 9 (Dec. 3, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-12/OIG-19-10-Nov18.pdf; DHS Off. of Inspector Gen., *CBP Continues to Experience Challenges Managing Searches of Electronic Devices at Ports of Entry*, OIG-21-63, at 13 (Sep. 23, 2021), www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-63-Sep21-Redacted.pdf.

may secure a device while they seek a warrant, *id.* at 388, a process that can be completed quickly and electronically, *see Missouri v. McNeely*, 569 U.S. 141, 154 (2013). The government claims that device searches are too rare to threaten Mr. Chavarria, MTD 12. If so, it should be easy to obtain warrants before performing them. What the Fourth Amendment forbids isn't a particular number of searches; it's the unchecked power to search a person's papers at an officer's discretion. *Steagald*, 451 U.S. at 220; *see Carpenter*, 585 U.S. at 369–70 (Alito, J., dissenting) (general warrants and writs of assistance were objectionable because of their "means"). The directives confer that power, and the amended complaint states a claim that they violate the Fourth Amendment.

## III. The Court Should Decide the Claim, and Dismissal with Prejudice Is Unwarranted

The government argues that "even if Plaintiff could establish Article III standing," the Court should decline to hear the case for "closely related equitable reasons." MTD 14–15. Each of those reasons fails.

### A. Equitable Discretion Is Not a Second Test of Standing or a Preview of the Merits

The government's first reason is that Mr. Chavarria cannot show a "clear" need for relief because no court of appeals has held that the Fourth Amendment requires a warrant, and granting relief would be "a marked departure" from settled border-search principles. MTD 14. However settled the government imagines the law to be, standing "in no way depends on the merits of the plaintiff's contention that particular

---

How much these searches advance any legitimate border interest is a factual question that cannot be resolved on a motion to dismiss.

conduct is illegal." *Warth*, 422 U.S. at 500. In deciding whether to hear a case, the court "must be careful not to decide the questions on the merits . . . and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha*, 320 F.3d at 235. If the government is right about the Fourth Amendment, the claim fails under Rule 12(b)(6). But that's not a reason to decline to decide it.

A federal court's obligation to decide cases within its jurisdiction is "virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)). Federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Sprint*, 571 U.S. at 77 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). Whatever discretion the Declaratory Judgment Act confers over declaratory relief, it does not reach the other relief Mr. Chavarria seeks. The APA directs that a reviewing court "shall . . . hold unlawful and set aside agency action . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B). And the injunction rests on the Court's equitable power to restrain unconstitutional conduct by federal officers, not on the Declaratory Judgment Act. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

**B. *Eccles* Supports Review Here**

The government's principal authority, *Eccles v. Peoples Bank of Lakewood Village*, 333 U.S. 426 (1948), MTD 14, shows why the Court should hear this case. In *Eccles*, a bank sought declaratory relief against a condition placed on its Federal Reserve System membership. The Board had "formally disavowed any intention to invoke that condition against" the bank, *id.* at 431, which the Court made decisive:

when an agency "has not only not asserted a challenged power but has expressly disclaimed its intention to go beyond the legitimate 'public interest' confided to it, a court should stay its hand." *Id.* at 434–35. The bank's injury also depended on a "concurrence of . . . contingent events," including a change in two agencies' policies, that was "too speculative to warrant anticipatory judicial determinations." *Id.* at 432. And the bank could protect itself by amending its own bylaws. *Id.* at 433.

Here, by contrast, CBP hasn't disavowed the power Mr. Chavarria challenges. It has doubled down, reaffirming it in a new directive in January 2026, and defending it throughout the motion. No chain of contingencies stands between the policy and the injury; the directives apply each time he crosses the border. And his only means of self-protection is to leave his devices at home, which is the injury itself. FAC ¶¶ 52–53. *Eccles* itself recognized that a court may review an agency's authority "at the behest of one so immediately and truly injured by a regulation claimed to be invalid, that his need is sufficiently compelling to justify judicial intervention." 333 U.S. at 434. That describes Mr. Chavarria. *See Cont'l Bank & Tr. Co. v. Martin*, 303 F.2d 214, 217 (D.C. Cir. 1962) (distinguishing *Eccles* because there was "no disavowal by the Board" comparable to "the disavowal in *Eccles*"); *Pan Am. World Airways, Inc. v. Boyd*, 207 F. Supp. 152, 159–60 (D.D.C. 1962) (entertaining declaratory action where, unlike in *Eccles*, the agency "has announced its intention to effectuate" its decision "and has taken steps to do so"). *Abidor*, on which the government also relies, MTD 14–15, applied *Eccles* without addressing the disavowal on which it turned. 990 F. Supp. 2d at 273–74.

The government suggests that a border search's legality is better addressed in a criminal case, on a motion to suppress. MTD 15. But Mr. Chavarria hasn't been charged with anything and has no suppression motion to file. A rule confining review to criminal cases would mean that only travelers whose devices yielded evidence of crime could ever obtain a ruling. Where a challenged policy continues "unabated and unreviewed," refusing declaratory relief would frustrate the purposes of the Declaratory Judgment Act. *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 126–27 (1974). *See also Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("clear abuse of discretion" to refuse declaratory relief).

### C. The Political Branches' Actions Have Provided No Reason to Abstain

The government asks the Court to stand aside so that Congress and the agencies have "the first opportunity to 'respond to any abuses . . . .'" MTD 15 (quoting *Abidor*, 990 F. Supp. 2d at 274). That premise fails in fact and in law.

In fact, the political branches' response is problematic. Congress directed CBP to adopt procedures for searching travelers' devices, to review and update them every three years, and to submit to three audits by the Department's Inspector General. 6 U.S.C. § 211(k)(1)(A), (4), (5). Each audit found CBP didn't comply with its own procedures. OIG-19-10, at 6; OIG-21-63, at 9; OIG-26-33, at 4. The last, issued two days before this motion, found that CBP had stopped tracking the information Congress required, leaving the Inspector General "unable to report on [it] as mandated by TFTEA," *id.* at 5; that CBP refused the auditors access to its "TECS relational database," necessary to conduct a "comprehensive risk analysis," *id.* at 8

(app. A); that CBP let five years pass between reviews despite the statute's three-year requirement, *id.* at 6; and that an officer conducted an advanced search citing nothing but "national security concerns," with no articulated facts, *id.* at 4. When CBP finally reissued its Directive in January 2026, it kept the authority challenged here. An agency's assurance that it "will protect the rights of individuals," MTD 15, is no substitute for independent review.

In law, Congress's failure to "withdraw or modify" CBP's authority, MTD 15, isn't approval of it. "Congressional inaction frequently betokens unawareness, preoccupation, or paralysis," and "[i]t is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law." *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969) (quoting *Girouard v. United States*, 328 U.S. 61, 69 (1946)). As the en banc D.C. Circuit has explained, because "the Framers of our Constitution deliberately made the passage of legislation difficult," "Congress simply cannot be obliged affirmatively to correct subsequent administrative interpretations . . . ; that is the responsibility of the courts." *Nat. Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1162 n.10 (D.C. Cir. 1987) (en banc) (quoting *Coal. to Preserve the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 917 (D.C. Cir. 1986), *rev'd in part on other grounds sub nom. K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988)). The principle applies with greater force here, where the question is whether a search policy complies with the Fourth Amendment, which Congress cannot settle. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196–97 (2012). And one judgment Congress

*has* expressed directs courts to "hold unlawful and set aside agency action . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B).

Nor has the Supreme Court deferred in these circumstances. In *Carpenter*, the government obtained cell-site records under a procedure Congress itself had prescribed. Nonetheless, the Court held that the statutory showing "falls well short of the probable cause required for a warrant" and required one. 585 U.S. at 317. In *Keith*, the Court decided that domestic-security surveillance requires prior judicial approval and only then invited Congress to prescribe standards within that holding. *United States v. U.S. Dist. Ct. (Keith)*, 407 U.S. 297, 322–24 (1972). After-the-fact review in criminal cases is no substitute, because it "would never reach the surveillances which failed to result in prosecutions." *Id.* at 318.

### D. Dismissal With Prejudice Is Unwarranted

The government asks that any dismissal under Rule 12(b)(6) be with prejudice because Mr. Chavarria has "already amended his complaint once." MTD 29. But he amended chiefly to challenge a directive CBP issued after he filed suit. FAC ¶ 35. Dismissal with prejudice is warranted only when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (quotations omitted). The government has identified no such defect. If the Court finds the amended complaint deficient, Mr. Chavarria respectfully requests leave to amend.

## CONCLUSION

For these reasons, the Court should deny the motion to dismiss.

DATED: October 30, 2026.

Respectfully submitted,

/s/ Amy Peikoff

AMY PEIKOFF
D.D.C. Bar No. CA00242
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, VA 22201
Telephone: (202) 888-6881
APeikoff@pacificlegal.org

JOHANNA TALCOTT*
Fla. Bar No. 1008094
Pacific Legal Foundation
4440 PGA Blvd., Suite 600
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
JoTalcott@pacificlegal.org
*Counsel for Plaintiff*

**pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2026, the foregoing document was filed via the court's electronic filing system, which provides notice of filing to the following:

Danielle D. Peraza
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
danielle.peraza@usdoj.gov
*Counsel for Defendants*

/s/ Amy Peikoff
AMY PEIKOFF